[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16056

_____

D.C. Docket No. 1:11-cr-20587-RNS-15


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACQUELINE MORAN,

Defendant,

ANTHONY ROBERTS,
DEREK ALEXANDER,
RAFAEL ALALU,
GARY KUSHNER,
SANDRA HUARTE,
JORGE MACLI,
ANTONIO MACLI,
BISCAYNE MILIEU HEALTH CENTER, INC.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 17, 2015)

Before HULL and JULIE CARNES, Circuit Judges, and ROTHSTEIN,[*] District Judge.

HULL, Circuit Judge:

After a jury trial, eight defendants—seven individuals and one corporation—appeal various aspects of their convictions and sentences in connection with the operation of a complex and sustained scheme of Medicare fraud. To begin, we recount certain evidence regarding the fraud scheme and outline the proceedings before the district court. We then review, with relevant factual background, the appellants' challenges to their convictions and sentences.

## I.  THE FRAUD SCHEME

### A.    Biscayne Milieu Health Center

In 1996, Biscayne Milieu Health Center, Inc. ("Biscayne Milieu"), located in North Miami, was incorporated in Florida. It offered a partial hospitalization program ("PHP") for patients with mental illness. In 1997, Biscayne Milieu was certified as a Community Mental Health Center; it received a provider number

_____
[*]Honorable Barbara J. Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

2

allowing it to bill Medicare for PHP treatment.  A PHP provides intensive outpatient treatment for patients with acute mental illness who are sufficiently ill that they would otherwise require inpatient hospitalization.  Medicare covers partial hospitalization programs providing treatment for mental illness, but only does so subject to a variety of conditions.

These Medicare rules and regulations are set forth in the Local Coverage Determination ("LCD").  Medicare requires that, to qualify for the PHP benefit, the services must be reasonable and necessary for the diagnosis and active treatment of the patient's condition.  The LCD makes clear that PHPs are structured to "provide patients with profound or disabling mental health conditions an individualized, coordinated, intensive, comprehensive, and multidisciplinary treatment program not provided in a regular outpatient setting."  A given patient must be experiencing "an acute onset or decompensation of a covered Axis I mental disorder," severe enough to prevent the patient from functioning in normal daily activities outside of a hospital setting.[1]  And there must also be a reasonable expectation that active treatment in the PHP will improve the patient's condition.  Patients should not

---

[1] "Axis I mental disorder" referred to the standardized, multiaxial system for classifying mental disorders found in the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).  Axis I covered clinical disorders including schizophrenia and other psychotic disorders, mood disorders, anxiety disorders, and substance-related disorders, while excluding personality disorders and mental retardation.  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27-28 (4th ed. 2000).  The American Psychiatric Association has since eliminated its use of the multiaxial system for classifying mental disorders, but the DSM-IV remained current and in effect during the period here discussed, hence its inclusion in the LCD.

remain in PHPs indefinitely.

Further, dual diagnosis patients are those suffering from both substance abuse and acute mental disorders. Under Medicare's regulations, dual diagnosis patients may be eligible for PHP treatment. But PHP treatment is not authorized for "individuals with persistent substance abuse" who "cannot or refuse to participate with active treatment of their mental disorder." An addicted individual may be admitted as long as the individual is not actively using the substance at the time of admission and has an acute mental health crisis.

For a patient to be admitted to a PHP, a "psychiatrist or physician trained in the diagnosis and treatment of psychiatric illness" must certify that the patient would require in-patient psychiatric hospitalization if the PHP services were not provided, and must attest that the services will be furnished while the patient is under the care of a physician and pursuant to an individualized plan of care.[2] Once a patient is enrolled in a PHP, Medicare requires documentation supporting the medical necessity of the claims made by the PHP provider. This documentation includes progress notes detailing the patient's participation in and response to the intensive treatment.

---

[2]The Local Coverage determination further provides that such individualized care is required because of the pervasive dysfunction associated with acute episodes of the covered mental disorders as well as the need for close medical supervision and coordination. PHP patients must be able to cognitively and emotionally participate in the active treatment process of a PHP for it to be effective.

4

Partial hospitalization in a PHP is a very intensive and expensive form of treatment for patients experiencing an acute mental health crisis. The evidence showed that Biscayne Milieu was paid $165 per patient per day for outpatient treatment or approximately $5000 per month per patient.

The owners and operators of Biscayne Milieu—the appellants here—agreed to be bound by these rules and regulations and to refrain from filing false claims. Because of the volume of claims processed by Medicare, the candor and truthfulness of the appellants, as health care providers making claims into the system, are absolute necessities.

As is too often the case, the appellants here concocted and engaged in a pernicious scheme to defraud Medicare and preyed upon vulnerable victims. To carry out the scheme, the owners and operators of Biscayne Milieu: (a) submitted false and fraudulent claims to Medicare for PHP services for patients who were not eligible for PHP treatment, for PHP services that were not medically necessary, for PHP services that were not eligible for Medicare reimbursement, and for PHP services that were not actually provided by Biscayne Milieu; (b) offered, paid, or received kickbacks and bribes for recruiting Medicare beneficiaries to attend Biscayne Milieu; (c) paid kickbacks and bribes to patients to ensure the attendance of ineligible Medicare beneficiaries at Biscayne Milieu; (d) concealed the submission of false and fraudulent claims to Medicare, the receipt and transfer of

5

the proceeds from the fraud, and the payment of kickbacks and bribes to patient recruiters and Medicare beneficiaries; and (e) diverted proceeds of the fraud for personal use.

Further, Biscayne Milieu employees and agents, including a doctor, therapists, nurses, and social workers, implemented the fraud by admitting ineligible patients to Biscayne Milieu, holding therapy sessions for patients who did not qualify for PHP treatment, falsifying group therapy notes to justify fraudulent claims to Medicare, and recruiting Haitian patients who did not qualify for PHP treatment by promising to assist such patients with applications for United States citizenship. At trial, numerous former employees of Biscayne Milieu, many of whom were separately indicted and had previously pled guilty to their participation in the fraud scheme, offered substantial evidence of the scheme's scope and design.

From 2007 to 2011, Biscayne Milieu submitted $57,689,700 in Medicare claims for PHP care of mentally ill patients, and Medicare paid $11,481,593 on those claims. This billing was largely fraudulent for the simplest of reasons. Virtually all of the patients treated at Biscayne Milieu's PHP were not suffering an acute onset of a covered Axis I mental disorder; did not have a reasonable expectation of improvement as a result of PHP treatment; or were not cognitively able to participate in PHP treatment. As the district court found, even the few

6

patients who might have had such an acute mental disorder did not receive the medical care that was required under the PHP rules.[3]

Rather than eligible PHP patients, the patient population principally fell into four categories: (1) chronic substance abusers; (2) elderly patients with dementia; (3) Haitian patients seeking immigration benefits; and (4) paid patients. Chronic substance abusers constituted an enormous percentage of the patient population at Biscayne Milieu. Trial witnesses testified that between 70 percent and 96 percent of Biscayne Milieu patients were chronic substance abusers. By virtue of their chronic substance abuse and lack of an acute mental disorder, the patients at Biscayne Milieu were, for the most part, not eligible for PHP treatment at all. Even though it was regularly admitting substance abusers, Biscayne Milieu also failed to provide meaningful treatment for substance abuse. In short, during the relevant period, Biscayne Milieu operated a patient mill supported by a kickback scheme that ensured an ongoing supply of patients.

The kickback scheme itself was highlighted by the use of what the parties often referred to as the "money sheet." The money sheet included columns for: the patient's name; the physician responsible for admitting the patient into the PHP;

---

[3]We recognize that, at trial, there was conflicting evidence regarding the scope of and intent underlying the fraud scheme. For example, there was conflicting evidence regarding whether patients qualified for PHP treatment and regarding which defendants knew what and to what extent. But for our purposes the jury verdict resolved those factual disputes, and we must view the evidence in the light most favorable to the jury verdict.

the initials of the person who referred the patient; and a box for each day of the month.  Biscayne Milieu billed Medicare, and paid the recruiter, for each day that had an "X" in the box, which showed that the patient attended therapy that day. Recruiters were paid only for days the patient attended therapy, and they were not paid for any days that the patient was absent.

## B.    The Seven Individual Defendants

In addition to the corporate defendant Biscayne Milieu, the seven individual defendants appealing here played various roles in the operation of the fraud scheme.

Defendant Antonio Macli was Biscayne Milieu's chief executive officer ("CEO").  He also served as Biscayne Milieu's primary contact with Medicare for purposes of provider certification.  Defendant Antonio Macli certified compliance with Medicare rules and regulations despite clear knowledge that Biscayne Milieu's patient inventory had been stocked through the payment of illegal recruiter kickbacks.  He also directed these recruiters to expand their efforts, including by recruiting patients from outside the state, and he ensured that recruiters masked the nature of their employment via false case management contracts.  Defendant Antonio Macli also instructed recruiters to recruit Haitian patients to attend the PHP, even though such patients did not qualify for PHP treatment.

8

At trial, former employees of Biscayne Milieu testified to defendant Antonio Macli's control over the operation. Former therapist Nikki Charles testified that Antonio Macli stated that it was "his business" and that he was "in charge," further adding, when disputes arose, that there were "too many chiefs and not enough [I]ndians." Recruiter James Edwards testified that he was hired as a recruiter by Antonio Macli with the explicit understanding that he would be paid $25 per client per day of treatment. Former therapist Manotte Bazile testified that Antonio Macli offered her $1000 in addition to her salary if she would recruit patients from the Haitian community. A government agent testified that Antonio Macli signed the checks on behalf of Biscayne Milieu that went to patient recruiters. And John Jackson, the former clinical director of Biscayne Milieu, testified that Antonio Macli signed the check that was cashed to pay off a patient who threatened to expose the fraud.

Defendant Antonio Macli's son, defendant Jorge Macli, was the day-to-day manager of Biscayne Milieu and also a designated point of contact for Medicare. Both Antonio Macli and Jorge Macli had an ownership interest in Biscayne Milieu as well as managerial control of the company. In his day-to-day management role, defendant Jorge Macli oversaw almost every significant aspect of the fraud. He had ultimate oversight over the patient recruiters. He himself recruited patient recruiters and then paid kickbacks to those recruiters. In addition, Jorge Macli

9

aided patient recruiters in financing the purchasing or lease of halfway houses used to board the patients recruited to attend the PHP at Biscayne Milieu.  In 2010, defendant Jorge Macli initiated the plan to have the patient recruiters sign fraudulent "case manager" contracts and insisted that recruiters, including defendants Derek Alexander and Anthony Roberts, do so.  He directed the recruiters to submit false invoices.  Defendant Jorge Macli even paid hush money to certain patients to quiet their complaints.  Defendant Jorge Macli directed the admission of patients he knew to be ineligible for PHP treatment, even over complaints from other staff.  He overrode staff attempts to deny admissions to elderly patients with dementia who were recycled from other PHPs and Haitian patients who were not mentally ill and who came to Biscayne Milieu in order to obtain immigration benefits.

Multiple witnesses testified to defendant Jorge Macli's centrality to the fraud scheme.  Former clinical director John Jackson testified that defendant Jorge Macli agreed, during Jackson's hiring process, to pay Jackson $25 per day per client attending Biscayne Milieu.  Further, Jackson testified to two details showing defendant Jorge Macli's clear awareness of the fraudulent nature of the enterprise.  First, Jackson and Jorge Macli agreed that patients Jackson would recruit from another, then-closed facility should enter Biscayne Milieu over time rather than all at once to avoid suspicion of the Medicare billing.  Second, concerned about how

10

Jackson would account for the additional income, Jorge Macli suggested that Jackson be paid for the recruiting via a dummy corporation or under a different individual's name to avoid suspicion regarding Jackson's fluctuating paycheck. Jackson also testified that Jorge Macli agreed to loan Jackson, as well as other recruiters, funds to expand halfway houses which would then send their residents for PHP treatment at Biscayne Milieu.

Separately, Rufus Cargile, who began as a patient at Biscayne Milieu but was later hired as a mental health worker, was sent to Detroit, Michigan, by defendant Jorge Macli for the purpose of recruiting substance abuse patients to Biscayne Milieu. Cargile testified that Jorge Macli paid for the trip to Detroit, where Cargile was from, with the expectation that Cargile would "do marketing for Jorge [Macli] and Biscayne Milieu." Referring specifically to the value of additional patients recruited, Cargile testified that Jorge Macli said, "I get two. You get one." Cargile further testified that marketing in Detroit was viewed as effective because of the limited set of treatment options available for Medicare patients seeking drug treatment. And, like his father Antonio Macli, defendant Jorge Macli also signed checks payable to the recruiters.

Defendant Antonio Macli's daughter, defendant Sandra Huarte, was in charge of Biscayne Milieu's Medicare billing and Biscayne Milieu's payroll. In this capacity, defendant Huarte oversaw and administered Biscayne Milieu's

11

payment of illegal kickbacks to patient recruiters.  Defendant Huarte also had the "money sheets" in her office, which she used to calculate the recruiter kickbacks. Further, recruiter James Edwards testified to defendant Huarte's possession of the "money sheets."  In addition, defendant Huarte instructed patient recruiters to recruit Haitian patients to attend the PHP who were not mentally ill and were not qualified for PHP treatment.  Defendant Huarte also paid therapists to falsify group therapy notes and was aware of numerous other fraudulent practices at Biscayne Milieu.  Therapist Manotte Bazile testified that defendant Huarte, on more than one occasion, requested that Bazile fill out falsified group notes and then paid Bazile, by hand-delivered check, in excess of her salary, when the notes were completed.

Defendant Huarte also served as CEO of North Biscayne Investment, Inc., a separate vehicle for transferring the proceeds of the health care fraud to defendants Antonio Macli and Huarte.  Several North Biscayne Investment bank accounts were involved in the transfer of fraudulent Medicare proceeds.  Defendant Huarte used the bank accounts to transfer fraudulent Medicare proceeds to herself and others.

From late 2008 through 2011, defendant Dr. Gary Kushner, a medical doctor licensed in Florida, was an attending physician at Biscayne Milieu and one of its main psychiatrists.  Dr. Kushner signed forms and charts authorizing treatment for

12

patients who were not eligible for PHP treatment, often without examining the patients or the charts. He authorized Biscayne Milieu to bill Medicare using his Medicare identifier as an attending physician to legitimate the fraudulent claims. Dr. Kushner admitted numerous patients he himself referred from local hospitals and also did so working in concert with patient recruiters. To hide the fact that such patients were chronic substance abusers, Dr. Kushner excluded substance-abuse issues from patient diagnoses.

Following admission, Dr. Kushner met with patients only briefly, for five to ten minutes. He had minimal interaction with the patients. He conducted the meetings merely to justify the creation of records that made it appear as though he was providing meaningful treatment. Dr. Kushner also signed forms that falsely certified he had conducted reviews of Biscayne Milieu billings and had discovered no fraudulent billings. These forms certified that Dr. Kushner had "conducted a systematic review of clinic billing to ensure that the billings [were] not fraudulent or unlawful" and that Dr. Kushner had not "discovered any unlawful charges." In addition to falsifying these documents, Dr. Kushner authorized other staff to complete his paperwork and sign documents for him. Defendant Huarte eventually obtained Dr. Kushner's electronic password in order to sign treatment plans for him.

Defendant Rafael Alalu, a licensed mental health counselor in Florida,

13

became the clinical director at Biscayne Milieu in late June 2010 after serving as a part-time therapist on the Biscayne Milieu staff since February 2010. He remained at Biscayne Milieu until his arrest in September 2011. Evidence at trial showed that defendant Alalu was clearly aware of the variety of patients improperly admitted to Biscayne Milieu. Alalu oversaw the work of mental health therapists and social workers, falsified numerous group therapy notes, and created false notes for patients who were not ill, never showed up, left sessions early, or who were not eligible or did not qualify for PHP treatment in the first place. Further, Alalu cut and pasted therapy notes from one patient into the files of other patients and knowingly oversaw other therapists doing so. At trial, the government introduced approximately 87 sets of therapy notes containing two or more notes that Alalu simply copied and pasted. In one example, Alalu created notes for seven patients on one date and, five weeks later, Alalu copied and pasted the information from those notes into identical notes for seven completely different patients. Alalu also encouraged the creation of fraudulent records by other therapists.

Defendant Derek Alexander and defendant Anthony Roberts each served as patient recruiters for Biscayne Milieu. Both Antonio Macli and Jorge Macli hired recruiters and authorized the payment of kickbacks. And Dr. Kushner steered the patients he treated at local hospitals to Roberts and some of the other recruiters, who would then compete to get credit for the clients.

14

From March 2010 through February 2011, defendant Alexander was a patient recruiter and Biscayne Milieu paid him $30 per patient per day for the referred patients' attendance. He received $47,500 in illegal kickbacks. From April 2008 through June 2011, defendant Roberts was a patient recruiter, and Biscayne Milieu paid him $30 per patient per day for the referred patients' attendance. He received $199,239.48 in illegal kickbacks.

Both Alexander and Roberts also created fraudulent invoices for purported case management services to Biscayne Milieu at a rate of $50 per hour, but the evidence showed that the payments to Alexander and Roberts were for patient recruiting and patient attendance at Biscayne Milieu, not for case management services. In fact, defendants Alexander and Roberts had no training or work experience in case management services.

Many of Alexander's and Roberts's recruited patients had chronic substance-abuse problems, had been admitted to hospitals after a serious relapse, and lived as tenants in privately run halfway houses for substance abusers. Roberts operated a halfway house and collected rent from his tenants, in addition to receiving illegal kickbacks from Biscayne Milieu. For example, Roberts's clientele included sixteen individuals who had multiple admissions to Biscayne Milieu, including one patient with five admissions and five billings to Medicare. Roberts also recruited other patient recruiters (including Wyatt Barnfield and

15

Gregory Murphy, who were both separately indicted and who both pled guilty).

Biscayne Milieu billed $750,300 to Medicare for defendant Alexander's recruited patients and collected $300,876.08. Biscayne Milieu billed $4,866,100 to Medicare for defendant Roberts's recruited patients and collected $887,085.31.

## C.    The Indictment

In June 2012, a federal grand jury returned a 44-count superseding indictment charging the eight appellants in this case, along with three additional co-defendants, with various offenses related to Biscayne Milieu's submission of fraudulent Medicare claims. The three co-defendants, not on appeal here, are Curtis Gates, Madeline Lucas, and Jacqueline Moran.[4]

Count 1 alleged a four-and-a-half year conspiracy to commit health care fraud under 18 U.S.C. § 1347, from January 2007 through August 2011, in violation of 18 U.S.C. § 1349. Seven individual defendants, Antonio Macli, Jorge Macli, Huarte, Dr. Kushner, Alalu, Moran, Lucas, and corporate defendant Biscayne Milieu were charged in count 1.

Counts 2 through 14 charged substantive health care fraud, in violation of 18 U.S.C. §§ 1347 and 2. Six individual defendants, Antonio Macli, Jorge Macli, Huarte, Dr. Kushner, Alalu, Moran, and corporate defendant Biscayne Milieu were

---

[4]Co-defendants Curtis Gates and Madeline Lucas pled guilty; Lucas testified for the government at trial. Co-defendant Jacqueline Moran went to trial and was convicted of Counts 1, 5-6, and 12; she has dismissed her appeal. The discussion below references the charges, sentences, and roles of only those eight defendants remaining in this appeal.

charged in counts 2 through 14.

Count 15 charged conspiracy to receive and pay health care kickbacks to recruiters to induce referrals of patients in connection with a federal health care program as prohibited by 42 U.S.C. § 1320a-7b(b)(1) and (2), in violation of 18 U.S.C. § 371.  Six individual defendants, Antonio Macli, Jorge Macli, Huarte, Alexander, Roberts, Gates, and corporate defendant Biscayne Milieu were charged in count 15.

Counts 16 through 26 charged the substantive payment of specific kickbacks to recruiters to induce patient referrals on dates ranging from August 2007 until June of 2011, in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).  Counts 27 through 29 charged the substantive receipt of specific kickbacks by recruiters in return for patient referrals, on 15 August 2007, 4 April 2010, and 6 June 2010, in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).  Two individual defendants, Antonio Macli and Jorge Macli, were charged in counts 16 through 26. Three individual defendants, Alexander, Roberts, and Gates, were charged in counts 27 through 29.

Count 30 charged conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  Counts 31 through 37 charged money laundering, in violation of 18 U.S.C. § 1957.  Counts 38 through 44 charged "concealment"

17

money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Three individual defendants, Antonio Macli, Jorge Macli, and Huarte, were charged with counts 30 through 44.

## II. DISTRICT COURT PROCEEDINGS

### A.    Jury Trial

On July 2, 2012, after extensive pre-trial proceedings, all eight appealing defendants proceeded to a jury trial. On July 9, 2012, after a jury was selected and sworn, trial commenced with opening statements.

The trial lasted over seven weeks, until August 24, 2012. Both pre-trial and during the trial, the district court ruled that an objection by one defendant would be adopted automatically by each defendant unless a defendant opted out of the objection.

As to the 44 counts charged, the defendants moved for judgments of acquittal during trial. The district court granted these motions as to counts 9, 10, 13, 14, 38-40, and 42 and denied them as to the other counts. The remaining counts were decided by the jury.

For clarity in our analysis below, we catalog here the jury verdict as against each defendant along with the sentences later imposed by the district court.

**B.    The Convictions and Sentences**

Defendant Antonio Macli, the CEO of Biscayne Milieu, was convicted of counts 1, 7, 15-26, and 30-37, and acquitted of counts 2-6, 8, 11-12.  He was sentenced to a total of 360 months' imprisonment as follows: 120 months as to each of counts 1, 7, and 31 through 37, to run concurrently; 60 months as to each of counts 15 through 26, to run concurrently; and 240 months as to count 30, to run consecutively to the terms imposed on the other counts.

Defendant Jorge Macli, Biscayne Milieu's day-to-day manager and the contact person for Medicare, was convicted of counts 1, 4, 7, 15-26, 30, 32-33, 35, and 37, and acquitted of counts 2-3, 5-6, 8, and 11-12.  He was sentenced to a total of 300 months' imprisonment as follows: 60 months as to each of counts 1, 4, 7, 15-26, 32, 33, 35, and 37, to run concurrently, and 240 months as to count 30, to run consecutively to the terms imposed on the other counts.

Defendant Huarte, responsible for Biscayne Milieu's Medicare billing and payroll, was convicted of counts 1, 2, 4-8, 11, 15, 30-31, and 34, and acquitted of counts 3 and 12.  She was sentenced to a total of 262 months' imprisonment as follows: 22 months as to each of counts 1, 2, 4-8, 11, 15, 31, and 34, to run concurrently, and 240 months as to count 30, to run consecutively to the terms imposed on the other counts.

19

Corporate defendant Biscayne Milieu was convicted of counts 1, 2-8, 11-12, and 15, and sentenced to a one year term of probation as to each count, to run concurrently.  The court also ordered defendants Antonio Macli, Jorge Macli, Huarte, and Biscayne Milieu to pay $11,481,593.43 in joint and several restitution.

Defendant Dr. Kushner, Biscayne Milieu's attending physician, was convicted of counts 1 and 2.  He was sentenced to a total of 144 months' imprisonment as follows: 120 months' imprisonment as to count 1, and 24 months' as to count 2, to run consecutively.  Dr. Kushner was also ordered to pay $9,341,767.24 in restitution.

Defendant Alalu, Biscayne Milieu's clinical director, was convicted of counts 1 and 3-4, but acquitted on count 11.  He was sentenced to concurrent terms of 100 months' imprisonment as to each count of conviction.  Alalu was also ordered to pay $5,614,353.20 in restitution.

Defendant Alexander, a patient recruiter, was convicted of counts 15 and 28.  He was sentenced to concurrent terms of 42 months' imprisonment as to each count of conviction; Alexander was also ordered to pay $300,876.08 in restitution.

Finally, defendant Roberts, a patient recruiter, was convicted of counts 15 and 29.  He was sentenced to 60 months as to count 15, and 27 months as to count 29, to run consecutively.  Roberts was also ordered to pay $887,085.31 in restitution.

All eight defendants filed timely notices of appeal.

## III.  ISSUES AND STANDARDS OF REVIEW

Given the number of defendants and overlapping claims, we list here the issues raised in this appeal and the standard of review applicable to each claim:

1) Whether sufficient evidence supports the convictions of six defendants, Antonio Macli, Jorge Macli, Huarte, Dr. Kushner, Alexander, and Biscayne Milieu.[5]  This Court reviews de novo whether there is sufficient evidence to support the jury's guilty verdicts, reviewing the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility evaluations in favor of the verdict.  United States v. Doe, 661 F.3d 550, 560 (11th Cir. 2011).

2) Whether count 1, conspiracy to commit health care fraud, and count 15, conspiracy to receive and pay health care kickbacks, are multiplicitous.  We review defendants' preserved challenges to the indictment de novo.  United States v. Woods, 684 F.3d 1045, 1060 n.14 (11th Cir. 2012).  Under Federal Rule of

---

[5]At the close of his brief, defendant Alalu states: "[t]he Appellant hereby adopts those arguments in the Briefs of his co-Appellants filed in this case as they may apply, pertain, or be available to him."  We read this to mean arguments as to the eight issues Alalu actually raises on appeal, rather than any other challenges to the convictions or sentences.  Regardless, the other appellants' claims as to sufficiency of the evidence are about evidence as to their individual guilt, not Alalu's, which does not help him.  See United States v. Cooper, 203 F.3d 1279, 1285 n.4 (11th Cir. 2000).  Alternatively, Alalu's adoption as to sufficiency of the evidence fails to satisfy 11th Cir. Rule 28-1(f), requiring that adoptions "include a statement describing in detail which briefs and which portions of those briefs are adopted."  In any event, and to the extent defendant Alalu raises a sufficiency of the evidence claim, there was ample evidence to convict defendant Alalu on counts 1, 3, and 4.  We note, also, that counsel for defendant Alalu became unavailable for oral argument in this case.  Nonetheless, Defendant Alalu has waived no issues and all of defendant Alalu's allegations of error are still submitted to the Court on the briefs.

21

Criminal Procedure 12, challenges to the indictment not raised before trial are waived. Fed. R. Crim. P. 12(b)(3)(B).

3) Whether the district court abused its discretion by declining to remove a juror because of an offensive comment made by defendant Alexander's attorney, and by subsequently denying a defense motion, made by Dr. Kushner's attorney, for mistrial on that ground. Separately, whether defendant Alexander was denied effective assistance of counsel when his attorney failed to withdraw after making that comment. This Court reviews a district court's decision on whether to remove a sitting juror for abuse of discretion. United States v. Register, 182 F.3d 820, 839 (11th Cir. 1999). The claim of ineffective counsel presents a mixed question of law and fact and therefore receives de novo review. Dell v. United States, 710 F.3d 1267, 1272 (11th Cir. 2013).

4) Whether the district court abused its discretion by admitting lay testimony regarding the eligibility of patients to receive PHP treatment, and the authenticity of Dr. Kushner's signature on patient records. The district court's evidentiary rulings, including the admission of witness testimony under Federal Rule of Evidence 701, are reviewed for abuse of discretion. United States v. Hill, 643 F.3d 807, 840-41 (11th Cir. 2011).

5) Whether the district court abused its discretion by denying defendant Jorge Macli's motion for mistrial based on a government witness's reference to the invocation of

22

Jorge Macli's right to counsel.  This Court reviews for abuse of discretion the denial of a mistrial motion based on a comment regarding a defendant's right to counsel.  See United States v. Reeves, 742 F.3d 487, 504 (11th Cir. 2014).

6) Whether all appellants are entitled to a new trial based on remarks made by the prosecutor during rebuttal closing argument.  This Court reviews de novo allegations of prosecutorial misconduct in closing argument.  United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006).

7) Whether the omission of a jury instruction defining "attempt" is plain error.  Because this issue is raised for the first time on appeal, we review it for plain error.  United States v. Lewis, 492 F.3d 1219, 1221-22 (11th Cir. 2007) (en banc).  Under the plain error standard, "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights."  United States v. McKinley, 732 F.3d 1291, 1296 (11th Cir. 2013).  Where these three conditions are met, the Court may then exercise its discretion to correct the error, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id.

8) Whether defendants Dr. Kushner and Biscayne Milieu were denied a fair trial by the cumulative effect of the alleged trial errors.

9) Whether the individual defendant-appellants' sentences are procedurally and substantively reasonable.  This Court reviews de novo the district court's

23

interpretation of the guidelines and its application of guidelines to the facts. Findings of fact by the trial court at sentencing, however, are reviewed for only clear error. United States v. Medina, 485 F.3d 1291, 1297, 1303 (11th Cir. 2007) (loss amount); United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010) (sophisticated means); United States v. DeVaron, 175 F.3d 930, 937 (11th Cir. 1999) (en banc) (role in the offense); United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (obstruction of justice). The district court's application of the vulnerable victim enhancement presents a mixed question of law and fact, which this Court reviews de novo. United States v. Arguedas, 86 F.3d 1054, 1057 (11th Cir. 1996). "The district court's determination of a victim's 'vulnerability' is, however, essentially a factual finding to which [this court] give[s] due deference." Id. And this Court reviews the final sentence imposed by the district court under an abuse of discretion standard. United States v. Pugh, 515 F.3d 1179 (11th Cir. 2008).

10)     Whether the district court correctly calculated Dr. Kushner's restitution. This Court reviews de novo the legality of a restitution order and reviews any factual findings about the restitution amount for clear error. United States v. Bane, 720 F.3d 818, 827 (11th Cir.), cert. denied, 134 S. Ct. 835 (2013).

## IV.  SUFFICIENCY OF THE EVIDENCE

### A.    Health Care Fraud Scheme

Five defendants, Antonio Macli, Jorge Macli, Huarte, Biscayne Milieu, and Dr. Kushner, all challenge the sufficiency of the evidence underlying their convictions for conspiracy to commit health care fraud under 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349 (count 1), and substantive health care fraud in violation of 18 U.S.C. §1347 (counts 2-8 and 11-12).[6]

Section 1347(a) provides a criminal penalty for anyone who: "knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or <u>fraudulent pretenses, representations, or promises</u>, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items or services."  18 U.S.C. § 1347 (emphasis added).[7]  Section 1349 provides a criminal penalty for anyone who "attempts or conspires to commit any offense under this chapter,"

---

[6]Defendant Alalu's brief did not challenge the sufficiency of the evidence to support his conviction under counts 1, 3, and 4.  But to the extent defendant Alalu arguably tried to do so, <u>see</u> footnote 5, <u>supra</u>, we conclude ample evidence supported his convictions.

[7]Further, in <u>United States v. Medina</u>, this Court concluded that: "Thus, the government has not shown that [defendants] made any false or fraudulent representations to Medicare, nor did they present evidence that [defendants] defrauded or attempted to defraud any health care program.  485 F.3d 1291, 1300 (11th Cir. 2007).  "[P]aying kickbacks alone is not sufficient to establish health care fraud" under § 1347(a)(2). <u>Id.</u> at 1298.  Rather, to sustain a § 1347(a)(2) conviction, there must be evidence of a false or fraudulent representation <u>to Medicare</u>, and "the defendant must be shown to have known that the claims submitted were, in fact, false." <u>Id.</u> at 1297; <u>see United States v. Vernon</u>, 723 F.3d 1234, 1273 (11th Cir. 2013).

which includes offenses under § 1347.  18 U.S.C. § 1349.  Thus, § 1349 makes it unlawful to attempt or conspire to commit a § 1347 crime of health care fraud.

To sustain the conspiracy conviction under 18 U.S.C. §1349, the government must prove that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it.  United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013).  Because the crime of conspiracy is "predominantly mental in composition," the government may prove these elements by circumstantial evidence.  Id.; United States v. Mateos, 623 F.3d 1350, 1362 (11th Cir. 2010) (affirming Medicare fraud convictions based on circumstantial evidence of knowledge).  The nature of conspiracy requires proof by such inferences and circumstantial evidence.  See Vernon, 723 F.3d at 1273; Mateos, 623 F.3d at 1362.

"[T]he government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy."  Vernon, 723 F.3d at 1273; see also Mateos, 623 F.3d at 1363.  Instead, the government's burden is only to prove that the defendant knew of "the essential nature of the conspiracy."  Vernon, 723 F.3d at 1273.  A conspiracy conviction will be upheld "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him."  Id.; Mateos, 623 F.3d at 1362.  "As for the voluntary joining element, the government

can meet this burden 'through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy.'" Vernon, 723 F.3d at 1274 (citation omitted).

Here, the jury was properly instructed as to all of the elements of the §§ 1347 and 1349 crimes.  In particular, and in contrast to the purely individual focus of the appellants' briefs, the jury was instructed that for these substantive crimes, where a defendant is a member of a conspiracy, he or she is criminally liable for his or her co-conspirator's reasonably foreseeable crimes committed during the course of and in furtherance of the conspiracy.  Pinkerton v. United States, 328 U.S. 640, 645-48, 66 S. Ct. 1180, 1183-84 (1946); United States v. Silvestri, 409 F.3d 1311, 1335 (11th Cir. 2005).

As recounted in detail above and summarized here, the government clearly introduced sufficient evidence to uphold each conviction as to each of these five appellants.

As to defendant Antonio Macli, ample evidence demonstrated his control of the Biscayne Milieu business.  Multiple witnesses testified that Antonio Macli was ultimately in charge.  Though he often delegated tasks which implemented the fraud scheme, this delegation was entirely consistent with his managerial control. Defendant Antonio Macli had access to the "money sheets" throughout the course of the conspiracy, and he directed the format of the false employee filing for "case

27

management" services.  After hearing seven weeks of trial evidence, the district court found at sentencing that Antonio Macli "had intimate knowledge of everything, including the amount that was going to be paid" by Medicare.

As to defendant Jorge Macli, his day-to-day management of Biscayne Milieu played a key role in the conspiracy.  He acted as the contact person for Medicare, hired recruiters to find and refer patients, approved of the recruiting of Haitian patients, and pioneered the recruitment of substance-addicted patients from out of state.

As to defendant Huarte, her significant role was made clear by her active involvement in the Medicare billing process.  She maintained the personnel records on the recruiters and implemented the controls regarding therapy notes.[8]  At sentencing, the district court found that defendant Huarte was not "similarly situated" to other defendants in the case who ultimately received lower sentences, additionally stating that Huarte's actions "created problems for patients by not giving them the help they deserved, and [ ] ruin[ing] the lives of a number of legitimate therapists."

As to defendant Dr. Kushner, his centrality to the scheme is easily stated. He referred and steered patients treated at local hospitals to Biscayne Milieu even though the patients were not eligible for PHP treatment.  Through his dual

---

[8]Sufficiency of the evidence as to Biscayne Milieu is shown by the sufficiency of evidence to convict the Maclis and Huarte.

positions at local hospitals and Biscayne Milieu, he was able to control patients going back and forth between Biscayne Milieu and the hospitals. Many of these same patients were repeatedly recycled through Biscayne Milieu after the PHP treatment failed to treat their underlying condition, most often active substance abuse. And as the district court found, the evidence showed Dr. Kushner did improper initial psychiatric evaluations, offered insufficient individualized treatment, and falsely certified that the Medicare rules had been followed.

Given the evidence recounted above and earlier in this opinion, we readily conclude the government presented overwhelming evidence for a reasonable jury to convict these five appellants of the conspiracy to commit health care fraud and the substantive health care fraud counts.

## B.    Kickbacks

Five defendants, Antonio Macli, Jorge Macli, Huarte, Biscayne Milieu, and Alexander, challenge the sufficiency of the evidence in support of their convictions for conspiracy to receive and pay health care kickbacks in connection with a federal health care program as prohibited by 42 U.S.C. § 1320a-7b(b)(1) and (2), in violation of 18 U.S.C. § 371 (count 15). Defendants Antonio Macli and Jorge Macli also challenge the sufficiency of the evidence to support their convictions as to counts 16-26, for the payment of specific kickbacks in violation of 42 U.S.C.

§ 1320a-7b(b)(2)(A).  Defendant Alexander also challenges his conviction for the receipt of a $990 kickback (count 28) in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).[9]

The Anti–Kickback statute, 42 U.S.C. § 1320a–7b(b), underlies these charges.  Subsection (b)(1) criminalizes the receipt, and subsection (b)(2) criminalizes the payment, of money "in return for referring an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a–7b(b)(1) and (2); Vernon, 723 F.3d at 1251-52.

Both defendants Antonio Macli and Jorge Macli hired recruiters and authorized the payment of kickbacks to the recruiters to induce them to locate and refer patients to Biscayne Milieu.  Defendant Antonio Macli signed checks payable to recruiters.  And the simple math of the kickback scheme is illustrated by the documented $990 payment to defendant Alexander.  The "money sheet" for a given time period showed that defendant Alexander was credited for 33 patient "days" in a two-week period.  He was paid $990, which equals 33 patient days at $30 a day.  The jury could reasonably infer a kickback scheme fully in operation.

In addition, the evidence showed that defendant Dr. Kushner also referred and steered patients he treated at local hospitals to defendant Roberts, a recruiter,

[9]Defendant Roberts does not challenge the sufficiency of the evidence to support his convictions on the kickback counts 15 and 29.

30

and some of the other recruiters, who then often fought over the doctor's referrals.

## C.    Money Laundering

Defendants Antonio Macli, Jorge Macli, and Huarte challenge the sufficiency of the evidence to support their convictions for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  That section makes it a crime to conspire to commit money laundering in violation of 18 U.S.C. §1956 or §1957.  Under §1956(h), "only two elements of conspiracy need be proven: (1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." United States v. Broughton, 689 F.3d 1260, 1280 (11th Cir. 2012).

The two objects of the money laundering conspiracy charged in count 30 are: (1) to conduct financial transactions involving the proceeds of specified unlawful activity knowing that the transactions were designed to "conceal or disguise" the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(B)(i) ("concealment money laundering"); and (2) to engage in monetary transactions involving "criminally derived property of a value greater than $10,000," such property having been derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 ("§ 1957 money laundering").  The "specified unlawful activity" was alleged to be health care fraud in violation of 18 U.S.C. § 1347.  The jury, by

31

special verdict form, found defendants Antonio Macli, Jorge Macli, and Huarte guilty of both objects of the conspiracy.

These three appellants argue their convictions cannot be sustained because they did not "conceal" their funds. This ignores that evidence showed the shuffling of money through various accounts that could be reasonably read as an attempt to conceal the proceeds of the fraud. Evidence also showed the use of sub-leasing agreements which, in effect, funneled fraud proceeds disguised as rent payments to Huarte.

Appellants' argument fails in any event. Though the jury found the defendants guilty of both objects of the conspiracy, the evidence need only be sufficient for any one of the charged objects to sustain a conviction. Medina, 485 F.3d at 1301. Concealment is an element of § 1956(a) money laundering crime, but not of § 1957 money laundering crime. United States v. Wetherald, 636 F.3d 1315, 1325 n. 2 (11th Cir. 2011). Section 1957 requires that the property have a value greater than $10,000, but it does not require that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design. "Due to the omission of a 'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood." Id. (internal citation omitted). The appellants would have to prevail on a sufficiency challenge to the underlying § 1957 counts in order to gain any traction here.

32

This they cannot do.  Ample evidence demonstrated the existence of monetary transactions in excess of $10,000 related to the above-discussed health care fraud in violation of 18 U.S.C. § 1347.  For example, at trial an FBI forensic accountant explained the movement of funds through accounts that took in money fraudulently obtained by Medicare billing and for which the defendants Antonio Macli, Jorge Macli, or Huarte were signatories.

Viewing the evidence in the light most favorable to the verdict, sufficient evidence was presented to convict defendants Antonio Macli, Jorge Macli, and Huarte on the money laundering conspiracy and substantive money laundering counts.

## V.  MULTIPLICITOUS COUNTS IN INDICTMENT

Defendant Huarte argues, for the first time on appeal, that her two conspiracy convictions, in count 1 and count 15, are multiplicitous.  Huarte contends that the kickback conspiracy count (count 15) is a lesser-included offense of the health care fraud conspiracy count (count 1) and thus violates the Double Jeopardy Clause.

Huarte's argument fails.  A defendant must object before trial to defects in the indictment, and the failure to do so waives appellate review.  Fed. R. Crim. P. 12(b)(3)(B) and (e).  See United States v. Pacchioli, 718 F.3d 1294, 1307-08 (11th Cir.), cert. denied, 134 S. Ct. 804 (2013) (refusing to consider same argument

33

because appellant did not raise it before trial).  Thus, defendant Huarte waived this argument as a challenge to the indictment by failing to make it before trial.

Of course, defendant Huarte still challenges on appeal her sentences on counts 1 and 15.  To the extent this multiplicity argument could be construed as a challenge to the sentences as being the result of multiplicitous convictions, see Pacchioli, 718 F.3d at 1308, we briefly address this argument and find it wholly wanting.  As to her multiplicity claims, Huarte has not demonstrated any error, much less plain error.  Huarte's convictions on counts 1 and 15 are not multiplicitous because they involve two conspiracies with different objects and thus different elements.

More specifically, count 1, a conspiracy under 18 U.S.C. § 1349 to violate 18 U.S.C. § 1347 and § 2, contains a different set of elements from count 15, a conspiracy under 18 U.S.C. § 371 to violate 42 U.S.C. § 1320a-7b(b)(1) and (2).  As charged in count 1 in this case, the § 1349 conspiracy to commit health care fraud under § 1347 required that fraud be the object of the conspiracy.  The main unlawful purpose of the conspiracy charged in count 1 was the false and fraudulent claims and representations made to Medicare.

As to count 15, however, § 371 prohibits two or more persons from conspiring to commit any offense against the United States.  18 U.S.C. § 371.  Further, § 371 requires proof of an overt act, while §1349 does not.  Moreover, the

unlawful purpose of the conspiracy in count 15 was the payment and receipt of kickbacks for patient referrals.  Unlike in count 1, the conduct (and even the submitted claims to Medicare) did not need to be fraudulent.  Even if a patient was eligible for PHP treatment and actually received covered medical treatment, it was still illegal for the co-conspirator owners and operators of Biscayne Milieu, including defendant Huarte, to conspire to pay recruiters for patient referrals and for those recruiters to receive payments.  See United States v. Njoku, 737 F.3d 55, 68 (5th Cir. 2013) (holding that a conviction for § 1349 conspiracy to commit a conviction for § 1347 health care fraud and § 371 conspiracy to pay health care kickbacks in violation of 42 U.S.C 1320a-7b(b) are not multiplicitous convictions), cert. denied, 2014 WL 1458281 (2014).  There is no multiplicity error in this case.

Alternatively, even if defendant Haurte were somehow correct, this would not impair her substantial rights.  Huarte's 22-month sentences as to counts 1 and 15 are to be served concurrently.  "Thus, any claimed multiplicity in the indictment would have been harmless error anyway."  Pacchioli, 718 F.3d at 1308 (holding any multiplicity error in the indictment was "obviously harmless because the arguably multiplicitous counts resulted in concurrent sentences").

## VI.  JUROR REMOVAL/ATTORNEY MISCONDUCT

Four defendants, Alexander, Roberts, Dr. Kushner, and Jorge Macli, argue that the district court abused its discretion by failing to remove a juror and denying

their motion for mistrial[10] after an episode occurring during defense counsel for defendant Alexander's cross-examination of therapist Barbara Morales.[11]

During his cross-examination of therapist Barbara Morales about her practice of copying and pasting group therapy notes, defendant Alexander's attorney discussed one effect of such copying and pasting, which was that pronouns were often incorrect with respect to the sex of the patient subject of the therapy note. In discussing this phenomenon, which illustrated the copying and pasting of notes, defendant Alexander's attorney made the following remark, highlighted in the exchange below:

> Q. Using, let's say, Jacqueline Moran and John Jackson,
> if they were two patients and you took John Jackson's
> report and you put it on Jacqueline Moran, all of a
> sudden, she would become a he because you cut and
> pasted sections?
> A. I agree with you.
> Q. If you did it in reverse and you took a section of
> Jacqueline Moran's evaluation and put it on John
> Jackson, he would then become a she?
> A. Yes.

___

[10]While the motion for mistrial was made by defendant Dr. Kushner's counsel, the other named defendants adopted the motion at trial. Further, they have adopted the issue on appeal and in their appellate briefs. Thus we consider the issue as to all four of these defendants.

[11]Defendant Alexander claims ineffective assistance of counsel arising from the same set of facts. This claim fails too. While this Court ordinarily decides claims of ineffective counsel through a 28 U.S.C. § 2255 motion, we may consider such claims on direct appeal if the record is sufficiently developed, as it is here. See United States v. Patterson, 595 F.3d 1324, 1328 (11th Cir. 2010). To prevail on an ineffective counsel claim in a criminal case, a defendant must show both that counsel's performance was deficient and that counsel's performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct 2052, 2064 (1984). Here, leaving undecided the question of performance, we find no showing of prejudice for the reasons discussed below.

Q. Which he probably wouldn't mind anyway.
A. Copy and paste.

The government immediately objected to the attorney's remark, and the district court sustained the objection. Defendant Alexander's attorney immediately apologized to the district court, witness, and jury. At the next recess, the district court upbraided the attorney.

During the same recess, the district court received a note from Juror 13 stating the following: "I want a written transcript for today's cross-examination by the lawyer who made the comment about John Jackson being gay, that he/she comment at around 2:40 p.m. I intend to take it to Gay Services (GLADD)."

When the jury returned, the district court advised the jury that it had "sternly admonished" defendant Alexander's attorney outside of the jury's presence, and that when the trial was over, anyone could get a copy of the transcript and take whatever action he or she felt was appropriate. The district court then asked the jury if it could be fair as to each defendant and make its decision only on the evidence, stating the following:

> But there are nine defendants on trial and I want to make sure and we all want to make sure that the fact that something out of place occurred, and hopefully it will be isolated and nothing of its kind will infect the rest of this trial, we all want to make sure that your decision as to each of the defendant's cases is made on the merits of the case and not on whether an attorney did something that they shouldn't have done.

37

So I need some assurances from all of you. I hope all of you share the concern that that kind of comment shouldn't be made, but I also need assurances from you, if you can give them to me, that you will be able to set that aside and to make your decision only on the evidence and the law as I instruct you; that you will consider each individual defendant's case and decide whether or not the Government has proven the case or not proven the case and not let this isolated incident affect you. I am not ordering you to do that, but I need to find out now if I can do that going forward.

So can you all agree that you can do that? Is there anybody that has any concerns about not being able to do that? Raise your hand now.

Okay. All right. So we're going to go forward.

No juror then indicated that he or she would not be able to proceed according to the district court's instruction. Defendant Alexander's attorney again apologized in the presence of the jury.

Defendant Dr. Kushner then moved for a mistrial on the basis of the preceding events. The district court denied the motion for mistrial.

The following day, the defendants moved to remove Juror 13. The district court denied the motion to discharge the juror. The district court questioned Juror 13 and also questioned each of the other jurors individually and outside the presence of the full jury. Each juror, including Juror 13, unequivocally stated that defendant Alexander's attorney's comment had no effect on his or her ability to weigh the evidence and to be fair to all parties.

38

Just cause exists to discharge a juror where the district court finds evidence that the juror cannot decide the issues fairly. Register, 182 F.3d at 840. The district court has substantial discretion in ferreting out and determining juror misconduct or bias. See id. And that discretion will not be disturbed absent a showing of bias or prejudice to the defendant. United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986).

Just cause cannot be shown on this record. Juror 13 assured the district court that he was able to be fair and decide the case based on the evidence, explaining that when he sent the note, "it wasn't so much myself that was offended by it or felt uncomfortable. It was some of the other jurors." Asked by the district court whether he could look at each of the defendants and at the prosecutors and tell them that the incident was "not even going to be any part of my thought process or discussion," Juror 13 replied: "Exactly. That's exactly how I feel. It won't be part of my emotions or discussions and it won't come up again."

Juror 13 was properly forthright in raising a concern about the comment and in answering the district court's questions. The district court was thorough in questioning the jury as a group and each juror individually. The refusal to remove Juror 13 was not an abuse of discretion. Nor was the district court's denial of the motion for a mistrial. The district court made a determination well within its

39

discretion that bias had not affected the jury such that a mistrial, an extreme

remedy, was warranted.

## VII.  ADMISSION OF LAY TESTIMONY

Defendants Alalu, Huarte, Dr. Kushner, and Biscayne Milieu argue that the

district court abused its discretion by admitting the lay opinion testimony of

various witnesses who testified as to the eligibility of patients to receive treatment

as well as, in the view of appellants', these patients' medical diagnoses.[12]

Lay opinion testimony must be: "(a) rationally based on the witness's

perception; (b) helpful to clearly understanding the witness's testimony or to

determining a fact in issue; and (c) not based on scientific, technical, or other

specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The

determination of whether testimony is properly admitted as lay opinion is based

upon the nature of the testimony, not whether the witness could be qualified as an

expert.  United States v. LeCroy, 441 F.3d 914, 927 (11th Cir. 2006).  And "Rule

701 does not prohibit lay witnesses from testifying based on particularized

knowledge gained from their own personal experiences."  Hill, 643 F.3d at 841.

---

[12]Defendant Dr. Kushner separately argues that the district court improperly admitted lay testimony about the authenticity of his handwriting and signature on certain patient files.  We reject this argument.  The record does not reflect that the testimony regarding Dr. Kushner's signature bore on the authenticity of his signature to the degree Dr. Kushner argues.  Rather, the bulk of the testimony was from witnesses who, in reviewing records while on the stand, would testify that a given signature "appear[ed]" to be Dr. Kushner's.  The only witness to speak to the features of Dr. Kushner's signature was Nurse Carmen Mercado, who testified about signing documents on behalf of Dr. Kushner.  We see no abuse of discretion in the instances where the district court allowed this testimony.

The record shows that the testimony here in question—principally from social workers and therapists at Biscayne Milieu—was based on personal knowledge and reflected the experience of treatment providers with the treatment process, and its shortcomings, at Biscayne Milieu. These witnesses were not standing in for experts. We see no abuse of discretion in the district court's decision to allow such evidence as lay opinion.

Moreover, the defendants at trial did not clearly object to the bulk of the testimony they now seek to challenge on appeal. Defendants Antonio Macli, Jorge Macli, and Huarte did file a pre-trial motion to exclude opinion testimony from witnesses not licensed to render medical diagnoses. Following a hearing, the district court deferred ruling on the motion until trial had commenced. But when most of the evidence then was admitted during trial, the defendants did not point out or renew their motion to exclude. While there were a few objections to certain questions during this lay opinion testimony, most of this lay opinion testimony came in without objection at trial. After ruling on evidentiary challenges as they arose during trial, the district court ultimately denied the motion in limine at moot. To the extent the defendants did not object during trial as the testimony came in, they cannot now show that it was plain error, an even more exacting standard, to allow such lay opinion testimony.

41

## VIII.  REFERENCE TO INVOCATION OF RIGHT TO COUNSEL

Defendant Jorge Macli challenges the district court's denial of his motion for mistrial, arguing that the government intentionally elicited testimony about his invocation of his right to counsel.  On direct examination by the government, Health and Human Services Special Agent John Mejia testified that he interviewed Jorge Macli after his arrest.  He testified that Jorge Macli waived his rights and agreed to be interviewed without his attorney present.  The prosecutor asked: "And at any point did Mr. Macli say he wanted his lawyer to be present?"  Agent Mejia answered: "Not initially."  Jorge Macli objected, and the district court struck the testimony.

Defendant Jorge Macli then moved for a mistrial on the basis that the government had elicited an impermissible comment on his right to silence.  The prosecutor apologized, stating that "the question was meant to be did he invoke his right to counsel at that time?"  The district court denied the mistrial motion, but offered to give a "more strongly worded curative instruction."

Jorge Macli denied this offer, along with the district court's offer to poll the jury about the effect of the remark, stating he did not want to "reemphasize" the testimony.  The district court stated it would take the mistrial motion "under advisement" until it was able to determine "whether the evidence [was] overwhelming or not."

42

The government made no further reference to it.  "A single, inappropriate reference to a defendant's post-arrest silence that is not mentioned again is too brief to constitute a Fifth Amendment violation."  Reeves, 742 F.3d at 505.  And, as the district court later found at the conclusion of the government's case, because the evidence of Jorge Macli's guilt was "overwhelming," any unintentional error the government made by eliciting that he had invoked his right to counsel at a different time was harmless.[13]

## IX.  PROSECUTOR COMMENTS AT CLOSING ARGUMENT

Defendants Alalu, Dr. Kushner, and Jorge Macli argue that the district court abused its discretion by denying motions for mistrial based on remarks made by the prosecutor during rebuttal closing argument.[14]  Appellants highlight two separate incidents.

After noting the defense attorneys' various attempts, in closing argument, to plead for sympathy for the circumstances of the various defendants, the prosecutor argued:

---

[13]At oral argument, counsel for Jorge Macli acknowledged that this challenge on appeal would be subject to harmless error analysis.

[14]Defendant Jorge Macli has adopted the others' arguments as to this issue.  Separately, and for the first time on appeal, defendant Biscayne Milieu challenges additional remarks made in the government's rebuttal closing; these remarks are reviewed for plain error.  Defendant Biscayne Milieu argues (1) that it was improper for the prosecutor to challenge the credibility of a defense expert and (2) that the prosecutor improperly vouched for the credibility of a testifying FBI agent.  Neither of these remarks, which drew no objection at trial, rises to the level of plain error.

> We are all human beings and it is perfectly
> understandable to feel badly for the positions that these
> defendants have put themselves in, but your job is to
> evaluate their guilt based on the law and the facts.
> And recognize this: Over the course of the last six-and-a-
> half weeks, I think you have gotten to know all of us very
> well, and I think that you would agree with me that all of
> the defense attorneys are very – are very talented, very
> diligent and very committed to their client's cause.
>
> Ask yourself this: If these attorneys are trying to subtlely
> tap into your feelings of sympathy, what does that say
> about what they know of what would happen –

Jorge Macli's attorney immediately objected, arguing this was not about sympathy but rather the government's attempt to use defense counsel's sympathy plea to show defense counsel's awareness of their clients' guilt.  The district court sustained the objection and struck the comment, telling the jury to disregard the prosecutor's last statement.

After the government's closing, the defendants moved for a mistrial, arguing the comments regarding the sympathy pleas had undermined the defense lawyers' effectiveness before the jury.  The district court denied the motion but gave a curative instruction to the jury, stating in part:

> So whether [the prosecutor] was misunderstood or
> misspoke, what he said concerning what the lawyers may
> or may not think is just not proper and it shouldn't be
> considered by you.
>
> All these lawyers are very ethical and you have seen
> them, as [the prosecutor] even pointed out himself, that

44

they are talented, they care about their clients, they care about the case and they care about doing the right thing. I think that is everybody's goal here and it has been throughout the last couple of months.

So please do not consider that when you go to consider your verdict tomorrow.

Defendants Dr. Kushner and Biscayne Milieu argue that another remark, which also gave rise to a denied motion for mistrial, resulted in an abuse of discretion by the district court. The prosecutor discussed the case of a repeat Biscayne Milieu patient who ultimately died. The prosecutor stated:

> The reason why Biscayne Milieu stopped billing for Richard Adderley is that he died. And he died -- we don't know if treatment -- if the better form of treatment would have helped, but we know that Biscayne Milieu didn't care. Richard Adderley was someone who was set up for failure at Biscayne Milieu like so many other people. That's not good faith. That is criminal intent. That's guilt.

Counsel for Huarte and Roberts, after the closing concluded, moved for a mistrial, arguing that the prosecutor had blamed Biscayne Milieu for Adderley's death. The district court denied the motion.

We find no abuse of discretion in the district court's denial of these motions. To show prosecutorial misconduct, the challenging defendants must show both that: "(1) the remarks [were] improper, and (2) the remarks must [have] prejudicially affect[ed] the substantial rights of the defendant." Reeves, 742 F.3d at 505 (internal quotation and citations omitted). "A defendant's substantial rights

45

are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." Id.

As to the prosecutor's comments regarding sympathy, the district court sustained the objection and gave curative instructions. Given the curative steps taken by the district court, we cannot now say that the defendants were substantially prejudiced by such comments. See United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985) (holding curative instructions sufficient to offset prosecutor's prejudicial comments).

As to the comments regarding Adderley, the district court, in denying the motion for mistrial, found that the prosecutor did not blame Biscayne Milieu for Adderley's death. This was not an abuse of the district court's discretion.

## X. DEFINING "ATTEMPT"

On appeal, defendant Biscayne Milieu argues that the jury instructions were fatally flawed in their failure to define the word "attempt." The government and several defendants submitted proposed jury instructions. None of the proposed instructions defined the word "attempt." Because Biscayne Milieu neither requested an instruction defining "attempt" nor objected to the court's jury charge, our review is limited to plain error. United States v. Gonzalez, 940 F.2d 1413, 1427 (11th Cir. 1991). "Jury instructions will only be reversed for plain error if, viewing the court's charge as a whole, it was so clearly erroneous as to result in a

46

substantial likelihood of a grave miscarriage of justice, or the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotations and citation omitted).

As the government argues, this Court has previously held that the failure to define "attempt" does not constitute plain error because, as a commonly used word, "attempt" is unlikely to confuse the jury such that a miscarriage of justice would result. We find no merit in defendant Biscayne Milieu's challenge to the jury instructions.

## XI. CUMULATIVE ERROR

Defendants Dr. Kushner and Biscayne Milieu raise cumulative error arguments on appeal. But the above-discussed challenges they cite do not establish a single error, let alone the "many errors" required for reversal where a single error would not require it. See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005). Accordingly, their cumulative error argument fails.

## XII. SENTENCING

Defendants Antonio Macli, Jorge Macli, Huarte, Dr. Kushner, Alalu, Roberts, and Alexander also appeal their sentences. We begin by reviewing the sentences imposed by the district court and then the defendants' challenges.

### A.    Calculating the Advisory Guidelines Ranges

1) Antonio and Jorge Macli

47

Defendants Antonio Macli and Jorge Macli had identical advisory guidelines calculations.  They each had a base offense level of six, pursuant to U.S.S.G. § 2B1.l(a)(2).  They received these increases to that offense level: (1) a 20-level increase under § 2B1.1(b)(1)(K), because the loss amount was more than $7 million but not more than $20 million; (2) a two-level increase under § 2B1.1(b)(2)(A)(ii), because their offenses were committed through mass-marketing; (3) a two-level increase under § 2B1.1(b)(9)(C), because their offenses involved sophisticated means; (4) a two-level increase under § 2B1.1(b)(13)(A), because their offenses involved the conscious reckless risk of death or bodily injury; (5) a two-level increase under § 3A1.1(b)(1), because they knew or should have known that a victim of their offenses was a vulnerable victim; (6) a two-level increase under § 3A1.1(b)(2), because the offense involved a large number of vulnerable victims; and (7) a four-level upward adjustment under § 3B1.1(a), because they were organizers or leaders of criminal activity that involved five or more participants or was otherwise extensive.

As a result, defendants Antonio Macli and Jorge Macli each had a total offense level of 40.  Antonio Macli and Jorge Macli each had no criminal-history points and a criminal history category of I.  Their total offense levels of 40 and criminal history categories of I resulted in advisory guidelines ranges of 292 to 365 months' imprisonment.

48

The district court sentenced defendant Antonio Macli to a total of 360 months' imprisonment: 120 months (the statutory maximum for each count) as to each of counts 1, 7, and 31 through 37, to run concurrently; 60 months (the statutory maximum for each count) as to each of counts 15 through 26, to run concurrently; and 240 months (the statutory maximum) as to count 30, to run consecutively to the terms imposed on the other counts.[15]

The district court sentenced defendant Jorge Macli to a total of 300 months imprisonment: 60 months (the statutory maximum on counts 15 to 26) as to each of counts 1, 4, 7, 15-26, 32, 33, 35, and 37 to run concurrently and 240 months (the statutory maximum) as to count 30, to run consecutively to the terms imposed on the other counts.

Both Antonio Macli and Jorge Macli were each ordered to pay restitution to Medicare in the amount of $11,481,593.42 (jointly with each other, defendant Huarte, and Biscayne Milieu).

2) Sandra Huarte

In calculating the advisory guidelines range, the Presentence Investigation Report ("PSI") grouped all of defendant Huarte's convictions together under

---

[15]The health care fraud conspiracy, substantive health care fraud, and substantive money laundering counts have a statutory maximum of ten years (120 months). 18 U.S.C. §§ 1347 1349, 1957. The kickback conspiracy and the substantive kickback payment and receipt counts have a statutory maximum of five years (60 months). 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)(2)(A). The money laundering conspiracy count has a statutory maximum of twenty years (240 months). 18 U.S.C. § 1956(a)(1).

U.S.S.G. § 3Dl.2(c) and (d). Huarte had a base offense level of six, pursuant to § 2B1.1 (a)(2). She received these increases to that offense level: (1) a 20-level increase under § 2B1.1(b)(1)(K), because the loss amount was more than $7 million but not more than $20 million; (2) a two-level increase under § 2B1.l(b)(2)(A)(ii), because her offenses were committed through mass-marketing; (3) a two-level increase under § 2B1.1(b)(9)(C), because her offenses involved sophisticated means; (4) a two-level increase under § 2B1.1(b)(13)(A), because her offenses involved the conscious reckless risk of death or bodily injury; (5) a two-level increase under § 3A1.1(b)(1), because she knew or should have known that a victim of her offenses was a vulnerable victim; (6) a two-level increase under § 3A1.1(b)(2), because her offenses involved a large number of vulnerable victims; and (7) a three-level upward adjustment under § 3B1.1(b), because she was a manager or supervisor (but not an organizer) of criminal activity that involved five or more participants or was otherwise extensive.

As a result, Huarte's total offense level was 39. Huarte had no criminal-history points and a criminal history category of I. Her total offense level of 39 and criminal history category of I resulted in an advisory guidelines range of 262 to 327 months' imprisonment.

The district court sentenced defendant Huarte to a total of 262 months' imprisonment: 22 months as to each of counts 1, 2, 4-8, 11, 15, 31, and 34, to run

concurrently, and 240 months (the statutory maximum) as to count 30, to run consecutively to the terms imposed on the other counts. The district court ordered Huarte to pay restitution to Medicare in the amount of $11,481,593.42 (jointly with Antonio Macli, Jorge Macli, and Biscayne Milieu).

   3) Dr. Gary Kushner

   In calculating defendant Dr. Kushner's advisory guidelines range, the PSI grouped counts 1 and 2 under U.S.S.G. § 3D1.2(d). Dr. Kushner had a base offense level of six, pursuant to § 2B1.1(a)(2). He received these increases to that offense level: (1) a 22-level increase under § 2B1.1(b)(1)(L), because the loss amount was between $20 million and $50 million; (2) a two-level increase under § 2B1.1(b)(2)(A)(ii), because his offenses were committed through mass-marketing; (3) a two-level increase under § 2B1.1(b)(9)(C), because his offenses involved sophisticated means; (4) a two-level increase under § 2B1.1(b)(13)(A), because his offenses involved the conscious reckless risk of death or bodily injury; (5) a two-level increase under § 3A1.1(b)(1), because he knew or should have known that a victim of his offenses was a vulnerable victim; (6) a two-level increase under § 3A1.1(b)(2), because his offenses involved a large number of vulnerable victims; (6) a two-level increase because he abused a position of public or private trust under § 3B1.3; and (7) a three-level increase under § 3B1.1(b), because Dr.

Kushner was a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive.

Dr. Kushner's total offense level was 43.  Dr. Kushner had no criminal-history points and a criminal history category of I.  His total offense level of 43 and criminal history category of I resulted in an advisory guidelines range of life imprisonment.  The statutory maximum term of imprisonment on each count, however, was ten years' imprisonment.  Accordingly, the statutory maximum total sentence that could be imposed was 20 years' imprisonment, applying the sentences consecutively.

The district court sentenced Dr. Kushner to a total of 144 months' imprisonment: 120 months' imprisonment (the statutory maximum) as to count 1, and 24 months' as to count 2, to run consecutively.  Dr. Kushner was also ordered to pay Medicare $9,341,767.24 in restitution.

   4) Rafael Alalu

In calculating defendant Alalu's advisory guidelines range, the PSI grouped counts 1, 3, and 4 under U.S.S.G. § 3D1.2(d).  Alalu had a base offense level of six, pursuant to § 2B1.1(a)(2).  He received these increases to that offense level: (1) a 20-level increase under § 2B1.1(b)(1)(K), because he was responsible for a loss amount of between $7 million and $20 million;  (2) a two-level increase under § 2B1.1(b)(9)(C), because his offenses involved sophisticated means; (3) a three-

level increase under § 3B1.1(b), because he was a manager or supervisor of criminal activity involving five or more participants; and (4) a two-level increase under § 3C1.1 for obstruction of justice.

Alalu's total offense level was 33.  He had no criminal-history points and a criminal history category of I.  His total offense level of 33 and criminal history category of I resulted in an advisory guidelines range of 135 to 168 months' imprisonment.  The district court sentenced defendant Alalu to a total of 100 months' imprisonment, concurrent terms of 100 months' imprisonment as to each count of conviction.  The district court also ordered restitution to Medicare in the amount of $5,614,353.20.

## 5) Anthony Roberts

In calculating Roberts's advisory guidelines range, the PSI grouped counts 15 and 29 pursuant to U.S.S.G. § 3D1.2(b).  Roberts had a base offense level of six, pursuant to § 2B1.1(a)(2).  He received an 18-level increase under § 2B1.1(b)(1)(J), because he was responsible for a loss of more than $2.5 million but not more than $7 million, and a two-level increase under § 2B 1.1 (b)(9)(C), because his offense involved sophisticated means.  Roberts did not receive an adjustment for his role in the offense.  Accordingly, his total offense level was 26.

Roberts's criminal history included (1) a 1991 conviction for armed robbery, for which he was sentenced to 12 years' imprisonment and (2) a 1994 conviction

for driving with a suspended license and driving under the influence. Roberts did not receive any criminal-history points for these convictions, and thus he had a criminal history category of I.

Roberts's total offense level of 26 and criminal history category of I resulted in an advisory guidelines range of 63 to 78 months' imprisonment.

The district court sentenced defendant Roberts to a total of 87 months' imprisonment: 60 months (the statutory maximum) as to count 15, and 27 months as to count 29, to run consecutively. Robert was also ordered to pay $887,085.31 in restitution.

6) Derek Alexander

In calculating Alexander's advisory guidelines range, the PSI grouped counts 15 and 28 under U.S.S.G. § 3D1.2(b). Alexander had a base offense level of six, pursuant to § 2B1.1(a)(2). He received a 14-level increase under § 2B1.1(b)(1)(H), because he was responsible for a loss of between $400,000 and $1 million. Alexander also received a two-level increase under § 2B1.1(b)(9)(C), because his offense involved sophisticated means. He did not receive any adjustments for his role in the offense.

Alexander's total offense level was 22. Alexander had zero criminal-history points and a criminal history category of I. Based on his total offense level of 22

and criminal history category of I, his guidelines imprisonment range was 41 to 51 months.

The district court sentenced defendant Alexander to a total of 42 months' imprisonment: concurrent terms of 42 months' imprisonment as to each of counts 15 and 28. Alexander was ordered to pay restitution to Medicare in the amount of $300,876.08.

## B.    Loss Amount

Defendants Antonio Macli, Huarte, and Alalu argue the district court clearly erred in determining they were each responsible for a loss amount of between $7 million and $20 million, which resulted in a 20-level increase to their respective offense levels under U.S.S.G. § 2B1.1(b)(1)(K) (2010).[16]

To prevail, defendants must show clear error in the district court's determination. United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011). The guidelines do not require a precise determination of loss, and a court "need only make a reasonable estimate of the loss, given the available information." Id. (quotation omitted). District courts are in a unique position to evaluate the evidence relevant to a loss determination, and thus, their determinations are entitled to appropriate deference. United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011). The government must establish the pertinent facts by a

---

[16]Defendants were sentenced using the 2010 version of the Sentencing Guidelines. Where relevant, we refer to that version of the guidelines.

preponderance of the evidence, which must be reliable and specific. Id. The district court, in turn, may make factual findings with respect to the loss amount based on evidence heard during trial, undisputed statements in the PSI, or evidence presented during sentencing. Id. However, a court may not speculate about the existence of facts that would result in a higher sentence. Barrington, 648 F.3d at 1197.

The guidelines provide for a 20-level increase for a fraud offense involving losses of between $7 million and $20 million. U.S.S.G. § 2B1.1(b)(1)(K) (2010). The loss amount "is the greater of actual or intended loss." Id. § 2B1.1 cmt. n.3(A). "Actual loss" is the reasonably foreseeable pecuniary harm resulting from the offense. Id. § 2B1.1 cmt. n.3(A)(i). "Intended loss" is the monetary harm that was intended to result from the offense, even if impossible or unlikely to occur. Id. § 2B1.1 cmt. n.3(A)(ii).

A district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003). To determine whether a defendant is liable for the acts of co-conspirators, the district court must first make individualized findings concerning the scope of criminal activity undertaken by the defendant. Id. Only

after the district court makes such individualized findings may it determine reasonable foreseeability.  Id.

Defendants Antonio Macli, Huarte, and Alalu have failed to demonstrate the district court clearly erred in calculating the amount of loss attributable to them. As an initial matter, the district court concluded that intended loss, rather than actual loss, was the appropriate measure of loss, and none of the parties challenge this finding.

Biscayne Milieu billed Medicare in excess of $57 million, but Medicare paid only $11.4 million on these claims.[17]  Defendants Antonio Macli and Huarte submitted evidence demonstrating that they had been aware of Medicare's lower reimbursement rate and had projected future revenue in accordance with that rate. Based on that evidence, the district court concluded that defendants Antonio Macli, Jorge Macli, and Huarte had intended to receive only the amounts paid by Medicare over the course of the conspiracy, totaling approximately $11.4 million, rather than the amounts billed, totaling $57,689,700.

In addition, the district court determined, based upon its review of the evidence at trial, that the overwhelming majority of patients at Biscayne Milieu were not eligible for PHP treatment or, if eligible, did not receive the necessary

---

[17]The $11.4 million amount triggered a 20-level increase under § 2B1.1(b)(1)(L) (2010) (amount between $7 million and $20 million).  The $57 million amount would have triggered a 24-level increase under § 2B1.1(b)(1)(M) (amount between $50 million and $100 million).

57

treatment.  See Bradley, 644 F.3d at 1290 (stating the district court's loss determination is entitled to deference because of the court's unique position to evaluate the evidence).  The district court found that the "overwhelming" majority of patients at Biscayne Milieu—not merely "70% or 80%"—had not received the care to which they had been entitled.  The defendants allowed recruiters to bring in chronic substance abusers, Haitian patients, and elderly patients who did not belong in PHP treatment.  The district court further found that it was highly unlikely that the clinic had provided medically necessary treatment to any PHP-qualified patients, and even if the clinic had provided such treatment, it could not "have happened in more than a handful of cases."  Thus, a loss amount of between $7 million and $20 million was appropriate.

The defendants rely in part on trial evidence presented by the government that they purport demonstrates only 46 percent of the Medicare claims were fraudulent, and thus the district court's loss calculation was incorrect.  But the evidence cited by defendants deals with a review of patient files for 46 percent of the entire patient population at Biscayne Milieu, without regard to whether they were even Medicare patients, and this evidence did not address in any way Medicare claims for those patients.  And the statistical analysis embodied in that prosecution testimony was thus not sufficiently reliable for drawing conclusions about the defendants' Medicare billing practices.  This is especially so given that

58

the district court separately concluded that even otherwise-eligible Medicare patients were not receiving the treatment to which they were entitled at Biscayne Milieu.

The district court did not clearly err in applying a 20-level increase to defendant Antonio Macli's and defendant Huarte's offense levels for a loss amount of greater than $7 million but not greater than $20 million.

The district court found that defendant Alalu was responsible for $14.5 million, the amount for which Medicare was <u>billed</u> during defendant Alalu's tenure in 2010-2011 at the clinic.  Unlike defendants Antonio Macli and Huarte, defendant Alalu neither identified evidence establishing that he knew the rate of reimbursement by Medicare nor that he intended for Biscayne Milieu to receive only the amounts paid by Medicare, rather than the amounts billed.

We also reject defendant Alalu's argument that his loss amount should be limited to the billings for only his individual patients and his personal actions. Alalu knew or should have known that most, if not all, of the patients at Biscayne Milieu were ineligible for PHP treatment.  He falsified group therapy notes and directed other staff to falsify group therapy notes in order to justify the submission of fraudulent claims to Medicare, he instructed staff to assist Haitian patients with immigration forms, and he altered patient files to make it appear as though patients were eligible for PHP treatment.  Because this case involved jointly undertaken

59

criminal activity, the appellants' relevant conduct includes all reasonably foreseeable acts and omissions of others in furtherance of the conspiracies. See U.S.S.G. § 1B1.3(a)(1)(B). The extensive fraudulent Medicare billing for which defendant Alalu was held responsible was a reasonably foreseeable consequence of his participation in the criminal conspiracies. And, indeed, the district court reduced the billing amount attributable to defendant Alalu's loss calculation to the 2010-11 time period of defendant Alalu's involvement.

Thus, the district court did not err by finding he was responsible for losses relating to his own fraudulent activity and the fraudulent activity of his co-conspirators during that time period. See Hunter, 323 F.3d at 1319.

## C.    Mass-Marketing Increase

Defendants Antonio Macli, Jorge Macli, and Huarte challenge the district court's imposition of a two-level increase for mass-marketing under § 2B1.1(b)(2)(A)(ii).[18] They argue the mass-marketing targeting Medicare beneficiaries was incidental to the fraud in this case and that the increase does not apply when the true victim of the offense is the United States.

---

[18]We note that, though his PSI included a two-level increase for mass-marketing, the district court declined to apply the increase to defendant Dr. Kushner. At the sentencing of defendants Antonio Macli, Jorge Macli, and Huarte, the district court stated (1) that Dr. Kushner was further removed from the mass marketing aspect of the scheme and (2) that the enhancement as to Dr. Kushner would not have affected Dr. Kushner's sentence, so the district court did not apply it.

The guidelines provide for a two-level increase to the offense level if the offense was committed through mass-marketing. U.S.S.G. § 2B1.1(b)(2)(A)(ii). The term "mass-marketing" means a "plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit." Id. § 2B1.1 cmt. n.4(A) (emphasis added). Generally, "offense" means the offense of conviction and all relevant conduct under § 1B1.3. Id. § 1B1.1 cmt. n.1(H). In the case of "jointly undertaken criminal activity," such as a conspiracy, relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Id. § 1B1.3(a)(1)(B); see also id. § 1B1.3 cmt. n.2.

Looking to the plain language of the guidelines, the mass-marketing increase applies to Antonio Macli, Jorge Macli, and Huarte. Patient recruiters engaged in mass-marketing in this case by targeting Medicare beneficiaries and bringing them to Biscayne Milieu for treatment. See U.S.S.G. § 2B1.1 cmt. n.4(A) (defining mass-marketing and including "other means"). Although these three defendants did not personally recruit patients for the clinic, they were substantially involved in the recruitment efforts. Huarte maintained the money sheets and settled disputes among patient recruiters as to which patients were associated with which

61

recruiters.  Antonio Macli and Jorge Macli hired recruiters, authorized the payment of kickbacks, and instructed recruiters to submit fraudulent invoices for case management.  Further, upon learning of Detroit's underserved population of Medicare-eligible substance abusers, Jorge Macli directed (and funded) Rufus Cargile to "market[]" Biscayne Milieu's services on out-of-state trips to Michigan.

As above, because this case involved jointly undertaken criminal activity, the appellants' relevant conduct includes all reasonably foreseeable acts and omissions of others in furtherance of the conspiracies.  See U.S.S.G. § 1B1.3(a)(1)(B).  Here, the mass-marketing efforts by the recruiters were reasonably foreseeable to Antonio Macli, Jorge Macli, and Huarte.

While this Court has not applied the mass-marketing increase in the health care fraud context, the Fifth Circuit has.  See United States v. Mauskar, 557 F.3d 219, 233 (5th Cir. 2009) (holding that face-to-face marketing, intended to reach a large number of persons for the purpose of facilitating health care fraud, can constitute mass-marketing under the guidelines); see also United States v. Isiwele, 635 F.3d 196, 198 (5th Cir. 2011) (applying Mauskar where defendant targeted elderly and low-income Medicare beneficiaries in order to submit fraudulent claims).

In Mauskar, the defendant conspired to defraud Medicare and Medicaid by, among other things, falsely certifying that ambulatory patients needed motorized

62

wheelchairs.  Mauskar, 557 F.3d at 224.  Recruiters facilitated the fraud by targeting and escorting beneficiaries to the defendant's clinic for evaluations.  Id.  The defendant objected to the mass-marketing increase on the grounds that he did not personally participate in the mass-marketing of patients.  Id. at 233.  The Fifth Circuit rejected that argument, noting the offense included all relevant conduct.  Id.  Because the case involved jointly undertaken criminal activity (conspiracy to commit health care fraud), the relevant conduct included all reasonably foreseeable acts and omissions of others in furtherance of the criminal activity, which included mass-marketing by recruiters.  See id.

Similarly here, the recruiters' conduct was not just foreseeable, but orchestrated and facilitated by defendants Antonio Macli, Jorge Macli, Huarte, and Biscayne Milieu's payments to the recruiters.  We need not decide the applicability of the mass-marketing increase to every possible health care fraud scheme.  The facts of this case center on the defendants' repeated attempts to target and profit from new patient populations.  For all these reasons, defendants Antonio Macli, Jorge Macli, and Huarte have shown no error as to the two-level increase for mass-marketing.

D.    Sophisticated-Means Increase

For the first time on appeal, defendants Huarte and Alalu argue that the district court erred in applying a two-level increase under § 2B1.1(b)(9)(C)

63

because their offenses involved sophisticated means.  They assert their individual actions in the health care fraud were not sophisticated.  We review objections to sentencing issues not raised in the district court for plain error.  United States v. Rodriguez, 751 F.3d 1244, 1257 (11th Cir. 2014).

Section 2B1.1(b)(9)(C) of the guidelines prescribes a two-level increase where the offense involves sophisticated means.  U.S.S.G. § 2B1.1(b)(9)(C).  "Sophisticated means" refers to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," and ordinarily includes conduct such as hiding assets or transactions through the use of fictitious entities, corporate shells, or offshore financial accounts.  Id. § 2B1.1 cmt. n.8(B).  In evaluating whether a defendant qualifies for the increase, the proper focus is on the offense conduct as a whole, not on each individual step.  See Barrington, 648 F.3d at 1199 ("Each action by a defendant need not be sophisticated in order to support this enhancement.").

Defendant Huarte cannot demonstrate error, plain or otherwise.  Her offense conduct as a whole involved a complex scheme to defraud Medicare and to conceal the fraud.  The offense involved the widespread use of kickbacks, the falsification of group therapy notes, and the laundering of proceeds from the fraud.  Huarte's billing and payroll actions alone facilitated and contributed significantly to the fraud.

So, too, with defendant Alalu. Though not charged in the money laundering counts of the indictment like defendant Huarte, sophisticated means were employed, both by Alalu and his co-conspirators, in implementing the health care fraud and kickback conspiracies.

The individual actions of defendants Huarte and Alalu, regardless of their sophistication, are irrelevant to the application of the increase. See Barrington, 648 F.3d at 1199.

## E.    Conscious or Reckless Risk of Death or Serious Bodily Injury

Antonio Macli, Jorge Macli, and Huarte also challenge the two-level increases to their respective offense levels under § 2B1.1(b)(13)(A) because the offense involved the conscious or reckless risk of death or serious bodily injury.[19] They argue no patients died at Biscayne Milieu or suffered a serious bodily injury.

The guidelines provide for a two-level increase if the offense involved "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(13)(A). Even if there is no evidence of death or serious bodily injury, the increase may nevertheless be appropriate, because the increase focuses on the defendant's disregard of risk, rather than on the result. Mateos, 623 F.3d at 1371.

The district court did not clearly err by finding these three defendants placed the Medicare beneficiaries at risk of death or serious bodily injury.

---

[19]This two-level increase for risk of death or bodily injury was not applied to defendant Alalu, the clinical director, nor to defendants Alexander and Roberts, the patient recruiters.

Biscayne Milieu admitted elderly patients with dementia, although the facility and staff were not equipped to meet the elderly patients' needs. Moreover, the elderly patients with dementia were placed in a population that consisted mostly of chronic substance abusers. Biscayne Milieu also failed to treat the substance-abuse issues in a meaningful way; dangerous drug relapses plagued much of the improperly treated substance-abusing patient population. By knowingly failing to provide necessary treatment to patients, the appellants placed the patients at risk of death or serious bodily injury.

At sentencing, the district court specifically addressed the risk of death or bodily injury increase, relying on trial testimony as to the "devastating" consequences of drug addiction when "not properly treated." Acknowledging that there was no evidence that any individual died specifically from the treatment at Biscayne Milieu, the district court nonetheless applied the increase to defendants Antonio Macli, Jorge Macli, and Huarte based on the evidence of "admission after admission after admission" that showed the defendants were creating the "reckless risk" of dangerous outcomes for the patients.

The district court did not err, much less clearly err, in applying this two-level increase.

66

## F.    Vulnerable-Victim Adjustment

Defendants Antonio Macli, Jorge Macli, and Huarte challenge the increase to their sentences for targeting vulnerable victims.  Defendant Huarte argues the two-level vulnerable-victim adjustment under § 3A1.1(b)(1) does not apply to her because she had no contact with patients.  Defendants Antonio Macli and Jorge Macli argue the only victim of the offense was the United States (Medicare) and the United States cannot be a vulnerable victim.

A two-level increase applies where a defendant knew, or should have known, that a victim of the offense was a vulnerable victim.  U.S.S.G. § 3A1.1(b)(1).  Another two-level increase applies if the offense involved a large number of vulnerable victims.  Id. § 3A1.1(b)(2).  A "vulnerable victim" is a person "who is a victim of the offense of conviction," and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  Id. § 3A1.1, cmt. n.2.  The increase applies when a defendant selected his victim to take advantage of that victim's perceived susceptibility to the offense.  Bradley, 644 F.3d at 1288.  Neither bodily injury nor financial loss is required for an individual to qualify as a victim.  Id. at 1288 & n.128.

Defendants Antonio Macli and Jorge Macli's argument that Medicare was the only victim of this fraud scheme fails.  Although Medicare was the primary

67

victim, elderly patients and substance-abuse patients at Biscayne Milieu also were victim of the offense. Elderly patients with dementia were transported daily from their assisted living facilities to Biscayne Milieu, which was not equipped to address their care during the day. Biscayne Milieu never treated other patients' substance-abuse issues in a meaningful manner. The substance abusers, many of who suffered regular relapses, were vulnerable because of their need for treatment. Moreover, many of these patients had little income and depended upon housing provided by Biscayne Milieu's patient recruiters or affiliates. Housing was often conditioned on their attendance at Biscayne Milieu. These patients were vulnerable because of their need for particular treatment and care that they could not receive at Biscayne Milieu.

Defendants Antonio Macli, Jorge Macli, and Huarte knew about these patients and the lack of meaningful treatment. Moreover, these defendants and their co-conspirators targeted the Medicare beneficiaries in order to further the fraudulent activity. Accordingly, the district court did not clearly err in applying a two-level increase for vulnerable victims under § 3A1.1(b)(1). None of the appellants have challenged the number of vulnerable victims, and, thus, the additional two-level increase under § 3A1.1(b)(2) also applies.

## G.    Aggravated Role in the Offense

Defendant Antonio Macli argues he should not have received a four-level increase under § 3B1.1(a) based on the district court's finding that he was an organizer or leader of extensive criminal activity.[20]  We review a defendant's role in the offense under § 3B1.1 only for clear error.  United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005).  For a factual finding to be clearly erroneous, we must be left with a definite and firm conviction that a mistake has been committed.  United States v. Rodriguez-Lopez, 363 F.3d 1134, 1137 (11th Cir. 2004).

Section 3B1.1(a) of the guidelines provides for a four-level increase if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  The defendant must have been the organizer or leader of at least one participant.  Id. § 3B1.1 cmt. n.2.  A participant is defined as "a person who is criminally responsible for the commission of the offense," but the person "need not have been convicted."  Id. § 3B1.1 cmt. n.1.  Factors to be considered include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a

---

[20]Alalu similarly argues he should not have received a three-level increase for his aggravated role in the offense.  We note, however, that the district court sustained Alalu's objection to that increase and we need not address that issue. Alalu does, however, ask for a minor role reduction, which we address separately.

larger share of the fruits of the crime, the degree of participation in planning the offense, the nature and scope of illegal activity, and the degree of control and authority exercised over others.  Id. § 3B1.1 cmt. n.4.

Here, the district court did not clearly err by finding defendant Antonio Macli was an organizer or leader of the conspiracy to commit health care fraud. As discussed above, defendant Antonio Macli incorporated Biscayne Milieu and was its CEO.  He served as Biscayne Milieu's primary contact with Medicare for purposes of provider certification.  He paid kickbacks to patient recruiters, directed recruiters to create fraudulent invoices, and instructed recruiters to recruit Haitian patients who were not eligible for PHP treatment.  He also incorporated numerous other business entities in Florida and opened multiple bank accounts through which he moved the proceeds of the health care fraud.  Based on the voluminous record from the seven-week trial, the district court did not err by applying the four-level upward increase for defendant Antonio Macli's role in the offense.

## H.    Minor-Role Reduction

Defendants Alalu, Alexander, and Roberts all argue they should have received a reduction to their offense levels for playing a minor role in the offense.

We review for clear error a district court's denial of a role reduction. United States v. Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir. 2010). A defendant bears the burden of proving his minor role by a preponderance of the evidence. Id.

When an offense is committed by more than one participant, a role reduction under § 3B1.2 may apply, and a defendant may receive a two-level decrease if his role was minor. U.S.S.G. § 3B1.2 & cmt. n.2. This reduction is only available "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." Id. § 3B1.2 cmt. n.3(A). A "minor participant" means any participant "who is less culpable than most other participants, but whose role could not be described as minimal." Id. § 3B1.2 cmt. n.5.

In determining whether a minor-role adjustment applies, the district court should consider, first, the defendant's role in the relevant conduct for which he has been held accountable at sentencing, and, second, his role as compared to that of other participants in his relevant conduct. United States v. Rodriguez De Varon, 175 F.3d 930, 940 (11th Cir. 1999) (en banc). As to the first prong of this analysis, "[o]nly if the defendant can establish that [he] played a relatively minor role in the conduct for which [he] has already been held accountable—not a minor role in any larger criminal conspiracy—should the district court grant a downward adjustment for minor role in the offense." Id. at 944. As to the second prong, the district court

71

should look at other participants only to the extent that they (1) are identifiable or discernable from the evidence, and (2) were involved in the relevant conduct attributed to the defendant. Id. "The conduct of participants in any larger criminal conspiracy is irrelevant." Id. Thus, in order to satisfy the second prong, the defendant must show that he was less culpable than most other participants in his relevant conduct. Id.

The district court did not clearly err by declining defendants Alalu, Alexander, and Roberts's requests for a two-level reduction for a minor role. Alalu played a significant role in the health care fraud by, as discussed above, falsifying group therapy notes, directing others to falsify notes, and instructing staff to make it appear as though certain patients were eligible for PHP treatment. Though Alalu may have been less culpable in the overall health care fraud than, for example, the Maclis, he was not less culpable than most other participants in the relevant conduct, particularly during the period he, as Biscayne Milieu's clinical director, directed and managed other therapists at Biscayne Milieu.

Defendants Alexander and Roberts's conduct was also central to the kickback scheme. Absent active recruitment of Medicare patients, Biscayne Milieu would have been unable to bill Medicare for those beneficiaries. Although both defendants contend their roles were minor compared to the members of the overall conspiracy, the conduct of the participants in the larger criminal conspiracy

72

is irrelevant to Alexander's and Roberts's roles in the kickback scheme, outlined earlier in this opinion. See Rodriguez De Varon, 175 F.3d at 944. Although Alexander received fewer kickback payments than several other recruiters, Alexander nevertheless recruited numerous patients and received $47,500 in kickbacks. Like many of the other recruiters, he was paid $30 per patient, per day of the patient's attendance, and he submitted fraudulent invoices to reflect a fraudulent $50 per hour pay rate for case management services, a job for which he had no training or experience. Likewise, Roberts recruited numerous patients and received over $199,000 in kickbacks. Notably, the $4,866,100 that Medicare was billed for Roberts's clients was significantly higher than the amounts Medicare was billed for any other recruiter's clients.

Accordingly, defendants Alexander and Roberts did not play minor roles and the district court did not err in denying a role reduction.

## I.    Obstruction of Justice

Defendant Alalu argues he should not have received an increase for obstruction of justice based on his perjury at trial. He argues that the record does not support a finding he intentionally lied on the stand or otherwise made inaccurate statements.

In reviewing a district court's imposition of an obstruction-of-justice increase, a district court must make a particularized assessment of the credibility of

73

a defendant, and so we accord special deference to the district court's credibility determinations and review for clear error. United States v. Banks, 347 F.3d 1266, 1269 (11th Cir. 2003).

The guidelines provide for a two-level increase if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. A defendant may obstruct or impede justice by "committing, suborning, or attempting to suborn perjury." Id. § 3C1.1 cmt. n.4(b). Perjury here is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993).

At defendant Alalu's sentencing, the district court noted that, "having had [the] opportunity to sit through the trial and observe Mr. Alalu's testimony," it found the increase warranted. The district court separately found, in response to a question from the government, that all of the excerpts of defendant Alalu's testimony provided by the government were "associated with perjured testimony."

In order to apply the increase, a district court must make an independent factual finding that the defendant gave perjured testimony on a material matter. United States v. Vallejo, 297 F.3d 1154, 1168 (11th Cir. 2002). Although a district

74

court preferably should make specific findings as to each instance of obstruction by identifying the materially false statements individually, it is sufficient if the court makes "a general finding of obstruction of justice that encompasses all of the factual predicates of perjury." Id. (quotation omitted).

Defendant Alalu's PSI noted that Alalu qualified for the obstruction-of-justice adjustment because he had lied during his testimony at trial. Specifically, defendant Alalu had provided false testimony that (1) the fabricated patient notes as to patient C.S. were merely a mistake; (2) he had no involvement in the creation of fabricated notes for a particular patient; (3) his copied-and-pasted group therapy notes were accurate; (4) he had no knowledge that Haitian patients attended Biscayne Milieu for immigration purposes; and (5) he never instructed co-conspirator Manotte Bazile to make the Haitian patients appear depressed.

The district court did not clearly err by applying the obstruction-of-justice adjustment. The court noted it had heard the testimony in the case and found that Alalu had lied on the stand. This finding is entitled to deference and is supported by the record. See Banks, 347 F.3d at 1269. For instance, defendant Alalu testified he had no knowledge that Haitian patients were attending Biscayne Milieu only for immigration purposes. Both witnesses Roselyn Charles and Manotte Bazile testified, however, that they had informed defendant Alalu of problems with Haitian patients attending Biscayne Milieu for immigration

75

purposes.  Although the district court did not address each instance of Alalu's alleged perjury individually, the district court made a sufficient general finding of obstruction of justice.  See Vallejo, 297 F.3d at 1168.  Defendant Alalu has shown no error.

## J.    Downward Departure and Downward Variance

Defendant Alalu argues the district court should have granted his request for a downward departure on the basis that his offense level substantially overstated the seriousness of his offenses.  He further argues the court abused its discretion by denying his request for a downward variance and that his sentence, albeit in the advisory guidelines range, is substantively unreasonable.

We review our subject matter jurisdiction de novo.  United States v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005).  We lack jurisdiction to review a district court's discretionary refusal to grant a downward departure, unless the district court incorrectly believed it lacked the authority to depart from the guidelines range.  United States v. Dudley, 463 F.3d 1221, 1228 (11th Cir. 2006).  We will assume the sentencing court properly understood its authority absent a record indication to the contrary.  Id.

Here, we lack jurisdiction to review the district court's discretionary refusal to grant Alalu's request for a downward departure, as the district court did not express a belief that it lacked authority to depart.  Id.

As to a downward variance request, a district court must impose a sentence that is reasonable. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). We review the reasonableness of a sentence under a deferential abuse-of-discretion standard. Id. at 41, 128 S. Ct. at 591. The party challenging the sentence bears the burden of establishing the sentence is unreasonable. United States v. Dean, 635 F.3d 1200, 1203-04 (11th Cir. 2011).

We examine whether a sentence is substantively reasonable in light of the totality of the circumstances and the 18 U.S.C. § 3553(a) factors. Gall, 552 U.S. at 51, 128 S. Ct. at 597. The § 3553(a) factors to be considered by a sentencing court include, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to protect the public from further crimes of the defendant; and (4) the applicable guideline range. 18 U.S.C. § 3553(a). A sentencing court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

A sentence is substantively unreasonable if it "does not achieve the purposes of sentencing stated in § 3553(a)." Pugh, 515 F.3d at 1191 (quotations omitted).

In addition, a sentence may be substantively unreasonable if a district court unjustifiably relied on any one § 3553(a) factor, failed to consider pertinent § 3553(a) factors, selected the sentence arbitrarily, or based the sentence on impermissible factors. Id. at 1191-92. Although we do not automatically presume a within-guidelines sentence is reasonable, we ordinarily expect such a sentence to be reasonable. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008).

As for the variance issue, Alalu has failed to meet his burden of establishing that a downward variance was warranted and that his within-guidelines sentence is substantively unreasonable. The district court considered the 18 U.S.C. § 3553(a) factors. The district court noted that, based on Alalu's actions in this case and his perjury at trial, the starting point for a reasonable sentence was above the advisory guidelines range. Nevertheless, the district court recognized Alalu's significant contributions to his community and gave Alalu credit for receiving only roughly $80,000 in salary and no other financial remuneration. Alalu's attempt to compare himself to co-conspirator Thomas Hamer is unpersuasive, as they are not similarly situated. Although both were therapists, Hamer was not Biscayne Milieu's clinical director, and did not direct the falsification of therapy notes or oversee the work of other therapists. Thus, the district court did not abuse its discretion in declining to vary below the advisory guidelines range in imposing a sentence of 100 months' imprisonment, at the low end of that range.

78

**K.    Upward Variance**

Defendant Roberts argues the district court abused its discretion by imposing an upward variance of 9 months to his advisory guidelines range of 63 to 78 months' imprisonment.  Roberts contends the district court relied upon clearly erroneous facts when it concluded that his criminal history category of I was understated and that defendant Alexander would have engaged in a life of helping people but for defendant Roberts's influence.  Roberts also asserts the probation officer already considered his criminal history when calculating the advisory guidelines range.[21]

If the district court sentences outside the advisory guidelines range, it should explain why the variance is appropriate in that particular case.  United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009).  While extraordinary justification is not required, Gall, 552 U.S. at 47, 128 S. Ct. at 595, the "justification for the variance must be sufficiently compelling to support the degree of the variance," United States v. Irey, 612 F.3d 1160, 1187 (11th Cir. 2010) (en banc) (quotation omitted).  Moreover, the district court, in imposing a variance, may consider conduct that a probation officer already had considered in calculating the defendant's advisory guidelines range.  See United States v.

---

[21] Roberts further asserts the district court actually imposed an upward departure, rather than an upward variance, and therefore failed to provide advance notice of the departure as required.  This argument lacks merit.  The district court specifically stated it was imposing a variance, not a departure, and the record supports the district court's statement.

79

Williams, 526 F.3d 1312, 1324 (11th Cir. 2008) (holding that, although defendant's previous offenses were part of the guidelines calculation, those offenses fit squarely into the history and characteristics factor of § 3553(a)(1) and could properly be considered by the court).

Defendant Roberts cannot show the district court abused its discretion by imposing an upward variance. The district court imposed the upward variance after finding that Roberts's criminal history category of I understated the seriousness of his criminal history, when Roberts previously was convicted of armed robbery, driving under the influence, and driving with a suspended license. Although Roberts argues the district court relied upon clearly erroneous facts when concluding his criminal history category of I was understated, he does not identify which facts are clearly erroneous. Roberts did not object to the conviction list in his criminal history as set forth in the PSI, and thus the district court was permitted to rely on those undisputed facts in determining the total sentence. See United States v. Philidor, 717 F.3d 883, 885 (11th Cir. 2013) (holding a district court may rely on undisputed facts contained in the PSI when sentencing). Likewise, the district court was permitted to consider Roberts's prior criminal conduct, even though the probation officer already had considered that conduct when calculating the advisory guidelines range. See Williams, 526 F.3d at 1324.

The district court also imposed the upward variance after finding defendant Roberts had been a poor role model for Alexander, which resulted in Alexander serving time in prison rather than devoting his life to helping people.  Although Roberts argues no facts in the record indicate Alexander would have engaged in a life of helping people, the district court noted its belief in Alexander's initial honest intentions after hearing the testimony at trial.  In any event, the upward variance is justified by Roberts's criminal history and the court's additional findings that Roberts had benefited from the scheme beyond his salary and had received kickbacks for recruiting patients who did not actually need or qualify for PHP treatment.  Defendant Roberts has shown no error.

## XIII. RESTITUTION

Defendant Dr. Kushner appeals his restitution order, arguing that the value of legitimate psychiatric services provided to Biscayne Milieu patients should have been subtracted from the restitution amount.  The district court ordered Dr. Kushner to pay restitution of $9,341,767.24, which represents the amount Medicare paid to Biscayne Milieu during Dr. Kushner's involvement in the conspiracy, a period during which Biscayne Milieu billed Medicare in the amount of $38,579,138.24.

Under 18 U.S.C. § 3663A(c), a defendant convicted of fraud must pay restitution to victims of the offense.  The government bears the burden of proving

81

the loss amount by a preponderance of the evidence, and the court must order restitution to each victim in the full amount of each victim's losses. 18 U.S.C. § 3664(e), (f)(1)(A).

"Restitution is not intended to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." United States v. Huff, 609 F.3d 1240, 1249 (11th Cir. 2010) (quotation omitted). For this reason, any value of the services or items received by the victim must be offset against the restitution order. Id. at 1248. Restitution is intended to put the victims in the same position they would have been if the crime had never been committed. Id. at 1249. And "because a defendant's culpability will not always equal the victim's injury," the amount of loss for restitution purposes will not always equal the amount of loss under the Sentencing Guidelines. Id. at 1247 (alteration and quotation omitted).

In Medicare kickback cases, we have previously held the proper measure of restitution is the amount of the kickbacks received, not the total amount billed to Medicare. See United States v. Bane, 720 F.3d 818, 827-28 (11th Cir. 2013). In Bane, we extended that logic to Medicare fraud cases not involving kickbacks, holding that a district court erred in failing to exclude the value of medically necessary treatment from the restitution amount. Id. at 828. We reasoned that failing to offset the amounts paid for medically necessary goods and services

against the restitution amount would be inconsistent with the purpose of restitution because it would give a windfall to the victims. Id. The failure to offset the costs would result in the victims receiving funds that they would have expended even absent the defendant's fraud. Id.

Here, the district court found that the actual payments from, not the amount billed to, Medicare should be subject to the restitution order. As applied to Dr. Kushner, that totaled $9,341,767.24.

In his opening brief on appeal, Dr. Kushner addressed the restitution issue by trying to revisit the district court's loss calculation discussed above (as opposed to squarely addressing the value of any PHP services allegedly rendered). His brief states that, at sentencing, he objected to the loss amount and, on appeal, he "adopts the same arguments." Under our clear precedent, this is insufficient. The "request that we ferret out and review any and all arguments it made below—without explaining which ones may have merit and where the district judge may have erred—clearly runs afoul of various Federal Rules of Appellate Procedure." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004). So, too, for Dr. Kushner's attempted adoption of "the briefs and arguments" of all his other co-defendants except Biscayne Milieu. This plainly fails to satisfy our circuit Rule 28-1(f) requiring parties adopting the briefs of other parties to "include a statement describing in detail which briefs and which

83

portions of those briefs are adopted." Defendant Dr. Kushner has not properly preserved his challenge to the district court's loss calculation. See Four Seasons, 377 F.3d at 1167.

Though defendant Dr. Kushner expands on his objection to the loss calculation in his reply brief, this comes too late. Dr. Kushner has abandoned the issue by failing to develop any argument on it in his opening brief. See United States v. Woods, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (holding an appellant abandons an issue if he fails to develop any argument in support of it in his opening brief); United States v. Evans, 473 F.3d 1115, 1120 (11th Cir. 2006) (holding we will not consider arguments raised for the first time in a reply brief).

Even if Dr. Kushner could resurrect an underlying challenge to the loss calculation for purposes of his restitution claim, his claim would fail in any event. The district court was not required to offset defendant Dr. Kushner's restitution amount by Medicare payments for legitimately rendered services because, in reaching the loss calculation, the district court determined that the pervasive absence of qualified PHP patients or real PHP treatment at Biscayne Milieu warranted holding defendants accountable for the amount Medicare actually paid due to the fraud. At defendant Dr. Kushner's restitution hearing, the district court specifically applied this reasoning to Dr. Kushner's restitution amount. Because the district court found that Biscayne Milieu did not render proper PHP treatment,

84

defendant Dr. Kushner has shown no evidence that the services he allegedly provided can somehow offset his restitution amount. The district court did not err in determining defendant Dr. Kushner's restitution.

## XIV. CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences as rendered by the district court.

**AFFIRMED.**