[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-15106
Non-Argument Calendar

_____

D.C. Docket No. 8:16-cr-00120-EAK-TGW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GARY TODD SMITH,
a.k.a. Todd Smith,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 28, 2021)

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Gary Todd Smith appeals the 480-months total sentence imposed following his convictions for (1) conspiracy to commit mail and wire fraud and (2) wire fraud affecting a financial institution. On appeal, he raises several arguments: (1) the district court incorrectly applied several sentencing guideline enhancements; (2) the district court clearly erred in determining the loss amounts for purposes of sentencing and restitution; and (3) the district court imposed a procedurally and substantively unreasonable sentence. For the following reasons, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On March 16, 2016, a federal grand jury indicted Smith on two counts: (1) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; and (2) wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. The indictment alleged that Smith, as Chief Operating Officer ("COO") of Smith Advertising and Associates, Inc. ("Smith Advertising"), along with his father, Gary Truman Smith, as Chief Executive Officer, and other co-conspirators made false representations and produced fraudulent documents in order to secure loans to cover the corporation's losses. In short, Smith orchestrated a complicated loan-fraud scheme involving invoice-factoring fraud and bridge-loan fraud that caused tens of millions in losses to the victim-lenders.

2

## A.    Invoice-Factoring Fraud Scheme

Part of the scheme involved Smith Advertising obtaining financing by a practice known as "invoice factoring."  In these transactions, the loan recipient borrows money against an account receivable, which is represented by a *bona fide* invoice from the loan recipient reflecting a third party's obligation to pay money for the goods or services that the loan recipient had provided.

Since at least 2005, Smith Advertising had been experiencing financial difficulties.  To raise capital to operate the business, it entered into a factoring arrangement with CapitalPlus Equity, LLC ("CapitalPlus").  Smith, through Smith Advertising, submitted fake invoices, which CapitalPlus relied on as evidence of valid accounts receivable to lend money to Smith Advertising under their factoring agreement.  Smith opened a series of post office boxes in Florida, Illinois, New Jersey, and New York to serve as addresses for the "clients" to whom the false invoices were addressed.  This scheme appeared to work for a while until sometime in early 2009 when CapitalPlus notified Smith Advertising that it would begin sending statements directly to the clients, rather than relying on Smith Advertising to notify them.

Ostensibly to preempt CapitalPlus from uncovering the scheme, Smith began to look for a replacement lender.  Eventually, Smith turned to an old business associate, who, with two other principals, formed Receivable Management Funding,

3

LLC ("RMF"), as Smith's new funding source. RMF had the same Sarasota, Florida, address as Smith Advertising, and Smith Advertising had an ownership interest in RMF. Smith Advertising and RMF entered into a factoring arrangement shortly thereafter.

In March or April 2009, CapitalPlus uncovered Smith Advertising's fraud because of the statements now being directly mailed by CapitalPlus to Smith Advertising's clients and notified Smith Advertising in May 2009 that it was in default under the terms of the factoring agreement, declaring all of Smith Advertising's obligations immediately due and payable. CapitalPlus, however, agreed not to report Smith to law enforcement if: (1) Smith Advertising paid it an outstanding obligation of approximately $4.5 million, (2) Smith and his father, Gary Truman Smith, provided written confessions, and (3) Smith and his father capped their salaries at $25,000 per month. CapitalPlus falsely told RMF that it was ending its relationship with Smith Advertising purely for business reasons, omitting that it had uncovered fraud from Smith Advertising. At some point in December 2009, all sides negotiated a deal for RMF to replace CapitalPlus.

### B.    Bridge-Loan Fraud Scheme

The other part of Smith's scheme involved bridge loans, which are short-term loans that are used until permanent financing is secured or existing debt is removed.

In this scheme, at least 129 individuals loaned money directly to Smith Advertising to fund what they thought were advance bulk purchases of advertising space. In reality, Smith Advertising used the money simply to stay current on its debt and to pay Smith's and his fellow conspirators' salaries. When its lenders asked for documentation, Smith Advertising provided fake invoices, unlawfully using the identities of people and entities to show that it owed money for having made an advance purchase of advertising space at a discount. Seventy-four lenders claimed a total loss exceeding $55 million.

Smith Advertising kept an instruction manual, known as the "Dark Side manual," that described how to create fake invoices and promissory notes, where to store them within the computer system, and which vendors to choose when fabricating invoices. The scheme even involved fabricating entire email threads, purchase orders, contracts, and other business-transaction documents. Smith Advertising also maintained two sets of financial books—one accurate and one false. According to the accurate set of books, Smith Advertising's total assets by February 2012 were valued at almost -$67 million and its total equity at approximately -$103 million.

Smith used several means to conceal the fraud. In late January 2012, he sent an altered screenshot of his account balance at Bridgeview Bank to his largest lender's bank, showing an account balance of $12.4 million when the actual balance

5

was -$12.4 million. He also sent his victims altered emails of conversations between him and a bank official in an effort to convince his victims that the company's bounced checks were the results of clerical errors. Additionally, Smith sent RMF a forged purchase order for $8 million, and he gave victim-lenders falsified balance sheets and records that showed Smith Advertising's income growing.

The scheme came to an abrupt end in early March 2012, collapsing under the weight of its increasing debt burden. The total loss to all victims was just short of $58 million and more than twenty-five victims lost all or part of their life savings. Less than a week earlier, in late February 2012, Smith Advertising's comptroller, Dawn Jackson, gave federal agents a balance sheet that reflected Smith Advertising's true financial position—a valuation of -$67 million and total equity of -$103 million.

## C.    Sentencing at the District Court

Smith pleaded guilty as charged before a magistrate judge, who recommended that the district court accept his guilty pleas. The district court accepted the recommendation and adjudged Smith guilty on both counts. The Presentence Investigation Report ("PSI") assigned a base offense level of 7. *See* U.S.S.G. § 2B1.1(a)(1). The PSI then added the following enhancements:

(1)    a 22-level enhancement because the loss amount exceeded $25 million,[1] pursuant to U.S.S.G. § 2B1.1(b)(1)(L);

---

[1] The PSI calculated the loss at $57,797,575.90.

6

(2)    a 6-level enhancement because more than twenty-five victims sustained financial hardship, pursuant to U.S.S.G. § 2B1.1(b)(2)(C);

(3)    a 2-level sophisticated-means enhancement, pursuant to U.S.S.G. § 2B1.1(b)(10)(C);

(4)    a 2-level vulnerable-victim enhancement, pursuant to U.S.S.G. § 3A1.1(b)(1);

(5)    a 2-level enhancement for abuse of a position of public or private trust, pursuant to U.S.S.G. § 3B1.3; and

(6)    a 4-level role enhancement, pursuant to U.S.S.G. § 3B1.1(a).

It then reduced the offense level by 3 for Smith's accepting responsibility, pursuant to U.S.S.G. § 3E1.1(a), (b), bringing Smith's total offense level to 42. Under the Sentencing Guidelines, Smith's range was 360 to 720 months, and restitution was recommended in an amount just shy of $58 million.

Smith's sentencing hearing lasted five days, which included two days devoted almost entirely to victim impact statements, one day to sworn testimony, and the remaining two days to argument. Smith objected to several parts of the PSI, including the 22-level loss-amount enhancement, the 2-level sophisticated-means enhancement, the 2-level vulnerable-victim enhancement, and the 2-level abuse-of-trust enhancement. The district court overruled each objection. Of note, the district court imposed a 24-level loss-amount enhancement based on its calculation that the intended loss from the scheme was in excess of $70 million. The district court then

7

turned to restitution and found the amount was $63,491,769.08.   Smith then requested a downward variance.

In its colloquy, the district court asked Smith why he did not walk away from his father's company and walk away from the fraud the company perpetrated.  The district court continued:

> Instead, you created the chaos for yourself and all these other people. It is just beyond belief that you don't even know anything about these victims. . . . [A]ll the purported good you're doing for other people, you didn't even care to find out what was happening to all these victims. And for the first time when they're here in this courtroom you hear about what happened to these people.  That doesn't show me much concern on your part.  I don't care all the purported good that I've seen on the videos, that I see in these letters.  I mean if you really are conscientious about other people and you really feel sorrow and you want to apologize to these people, you didn't even really find out who they were and you really didn't care.  You're wallowing in your own self-pity.  You know, I don't think I've ever said this [at] any sentencing in 45 years.  I had the opportunity because of friends to go to England and to see some things in England, . . . and on the arterial road in Romford, . . . is a pub.  The pub is called The Plough, and outside of that pub is a gallows, and the whole corner is known as Gallows Corner to this day, and the public used to be where they held court and when they caught a thief, they brung him to the public and they had a trial and justice was immediate and swift and the remains of the Defendant were hanging there at Gallows Corner.  That's what they did to thieves in those days and that Gallows Corner and that hanging arrangement is still there to this day.
>
> We've become, quote, "more civilized," closed quote, in how we deal with thieves because you're no different than a blatant thief.

The district court denied Smith's motion for a downward variance, stating that it wished there were a way it could make the victims whole and that it wished Smith

8

could face the fact that many of his victims were going to die earlier in their lives because he took everything from them.

In sentencing Smith, the district court reasoned that 360 months was too short and, although it denied the motion for a downward variance, that 720 months would be "essentially a life sentence" with no hope that Smith or his friends would be able to reimburse the victims. The district court settled at a sentence of 480 months to be followed by 36 months of supervised release. The sentence consisted of a 360-month term as to Count 1, to be followed by a consecutive 120-month term as to Count 2. The district court also imposed several special conditions of supervised release, including that Smith write a letter to each victim in the case that "included in it steps that you are taking to have friends build a fund for reimbursement payable to the clerk's office, U.S. District Court on the restitution owed by you in this case."

The government then asked the district court to make a finding on the record that it would have imposed the same sentence "regardless of the [sentencing] guidelines." The district court agreed and responded that it would have imposed the same sentence, as it was "a fair sentence under the circumstances." The district court entered judgment, and this appeal followed.

## II.    ANALYSIS

As noted from the outset, Smith raises several issues on appeal regarding his sentence, which we address in turn below.

**A.    The District Court's Imposition of Sentencing Enhancements**

Smith asserts that the district court erred by imposing the following sentencing enhancements under the Sentencing Guidelines: (1) the loss-amount enhancement, (2) the abuse-of-trust enhancement, (3) the vulnerable-victim enhancement, and (4) the sophisticated-means enhancement.  With respect to issues arising under the Sentencing Guidelines, we review

> purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's application of the [sentencing] guidelines to the facts with "due deference."  And the "due deference" standard is, itself, tantamount to clear error review.  For a finding to be clearly erroneous, this Court "must be left with a definite and firm conviction that a mistake has been committed."

*United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (citations omitted) (quoting *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136–37 (11th Cir. 2004)).

1.    Sentencing Enhancement Based on the Intended Loss Amount

Smith argues the district court erred in its calculation of the loss amount in excess of $70 million, which therefore resulted in a 24-level sentencing enhancement under U.S.S.G § 2B1.1(b).[2]  "We review the district court's calculation of the loss

---

[2] A defendant convicted of a fraud offense receives a 22-level enhancement if the loss amount is between $25 million and $65 million, and a 24-level enhancement if the loss amount is between $65 million and $150 million.  U.S.S.G. § 2B1.1(b)(1)(L)–(M).

amount . . . for clear error." *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015).

Pursuant to the Sentencing Guidelines, when a court calculates the amount of "loss," it is to apply either "actual loss" or "intended loss," whichever is greater. U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict." *Id.*

Here, the district court determined and calculated the loss amount based on intended loss, rather than actual loss. According to Smith, however, the intended loss of the fraud was zero because investors would not have lost money if the scheme had been successful; that is, because Smith "hoped" that Smith Advertising would "eventually right itself financially, . . . the victims would incur no loss in the end." Thus, Smith argues, because the actual loss was greater than the intended loss, the district court erred in its calculation of the loss amount. We find no merit in this argument.

As the government correctly points out, a court may infer a defendant's intent based on circumstantial evidence, *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001), and, as our sister circuit has held, the district court was not bound to accept Smith's self-serving assertions that contradict the objective evidence, *United States v. Anderson*, 68 F.3d 1050, 1054 (8th Cir. 1995). Thus, even

11

if Smith subjectively hoped that Smith Advertising's fortunes would turn around at some point, he nonetheless continued soliciting fraudulent loans through 2012 until Smith Advertising collapsed deep in debt. Smith's own actions therefore contradict and undermine his claims that he intended to repay the victims, and his argument that the intended losses were zero is unpersuasive. We therefore conclude that the district court did not clearly err by using the intended loss method to calculate the loss amount, nor did it clearly err by calculating the intended loss to be in excess of $70 million.

2.    Sentencing Enhancement Based on Abuse of a Position of Public or Private Trust

Smith next argues the district court erred by imposing a 2-level enhancement for abuse of a position of public or private trust pursuant to § 3B1.3 of the Sentencing Guidelines. "We review *de novo* the district court's conclusion that the defendant's conduct justifies the abuse-of-trust enhancement." *United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010).

The Sentencing Guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. For the abuse-of-trust enhancement to apply, the government must establish: (1) the defendant held a place of private or public trust, and (2) he or she abused that position in a way that significantly facilitated the commission or

12

concealment of the offenses. *United States v. Walker*, 490 F.3d 1282, 1300 (11th Cir. 2007). Moreover, "this enhancement only applies when the victim conferred the trust." *Id.* "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. Because all fraud cases involve some amount of misplaced trust, for this enhancement to apply, "there must be a showing that the victim placed a special trust in the defendant beyond ordinary reliance on the defendant's integrity and honesty that underlies every fraud scenario." *Ghertler*, 605 F.3d at 1264 (quoting *United States v. Williams*, 527 F.3d 1235, 1250–51 (11th Cir. 2008)).

Here, Smith argues that the victims did not place any special trust in him beyond that to be expected in any typical business transaction or that to be found in any typical fraud case. While Smith contends that he engaged only in "arm's length commercial transactions" without a "special position of trust," this ignores the relationship between Smith Advertising and RMF. Again, Smith Advertising had an ownership interest in RMF; the RMF victim-lenders trusted their financial partner to provide accurate information about Smith Advertising's financial status and accounts receivable. Smith used his position as COO of Smith Advertising to facilitate and conceal his offenses, and his position as an executive of Smith Advertising and apparent investor in RMF led the RMF victim-lenders to believe

13

that he had an interest in the success of both ventures. We therefore conclude that the district court did not err in concluding that Smith's conduct justified the abuse-of-trust enhancement.

Additionally, the district court properly applied the two-level abuse-of-trust enhancement under our precedent establishing the means-of-identification rationale for such enhancement. *See United States v. Cruz*, 713 F.3d 600, 608–09 (11th Cir. 2013). Under that standard, if a defendant "exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification," an abuse-of-trust enhancement is applicable. U.S.S.G. § 3B1.3, cmt. n.2(B). The Sentencing Guidelines define "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." *Id.*; *see also*, 18 U.S.C. § 1028(d)(7).

Here, Smith used names and signatures that he obtained through his role at Smith Advertising to commit and conceal his fraud. In *Cruz*, we recognized the means-of-identification rationale for the first time and applied it in affirming a defendant's sentence based on her position of authority at a big-box store, her use of credit cards without authority, and her use of the products of identity theft for personal gain. *Id.* at 609; *cf. United States v. Auguste*, 392 F.3d 1266, 1267–68 (11th Cir. 2004) (reasoning a credit card qualifies as "means of identification" for sentencing purposes). Subsequently, we have held that names and signatures qualify

14

as means of identification under 18 U.S.C. § 1028. *United States v. Wilson*, 788 F.3d 1298, 1310 (11th Cir. 2015). Thus, because *Cruz* applies to Smith's actions here, the district court did not err in concluding that Smith's conduct justified the abuse-of-trust enhancement, separate and apart from Smith's relationship with the RMF victim-lenders.

3.    Sentencing Enhancement Based on Involving a Vulnerable Victim

Smith argues that the district court erred in applying the two-level enhancement for a vulnerable victim, pursuant to § 3A1.1(b)(1) of the Sentencing Guidelines. We review *de novo* the district court's application of a vulnerable-victim enhancement, "as it presents a mixed question of law and fact," but we "give due deference to the district court's determination that a victim was vulnerable, as this is a factual finding." *United States v. Kapordelis*, 569 F.3d 1291, 1315–16 (11th Cir. 2009).

The Sentencing Guidelines provide for a two-level increase if the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is "a victim of the offense of conviction . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* § 3A1.1 cmt. n.2. The Sentencing Guidelines commentary explains:

15

> The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.

*Id.* The enhancement is appropriate where the defendant knew the victim had unique characteristics that made the victim more vulnerable to the specific crime than other potential victims of the crime. *United States v. Pierre*, 825 F.3d 1183, 1195–96 (11th Cir. 2016). The government need not show that the defendant intentionally targeted a vulnerable victim, but only that he knew or should have known that a victim was vulnerable. *United States v. Birge*, 830 F.3d 1229, 1233–34 (11th Cir. 2016).

The district court based this enhancement on its finding that one of Smith's victims qualified as a "vulnerable victim." Specifically, testimony from the sentencing hearing shows that the vulnerable victim's sister—who was also a victim—testified that she had emphasized to Smith that her sister had "special needs" and that he knew that fact well into the perpetration of his scheme. Smith, however, contends that he did not know and could not have known that one of the victims was unusually vulnerable and the evidence was insufficient to establish that she was vulnerable, apparently taking issue with the phrase "special needs." Indeed, Smith argues that "special needs" could refer to someone "going through" a difficult time, like a divorce or even purchasing a home. We reject this assertion that "special

16

needs" is somehow vague and that Smith misunderstood this particular victim's vulnerabilities. *See United States v. Etoty*, 679 F.3d 292, 297 (4th Cir. 2012) (explaining that the inquiry is "whether the defendant knew that the victim was vulnerable, not whether he knew the precise source of that vulnerability"). Giving due deference to the district court's finding that one of Smith's victims qualified as a "vulnerable victim," we conclude that the district court did not err in applying the vulnerable-victim enhancement here.

### 4. Sentencing Enhancement Based on an Offense Involving Sophisticated Means

Finally, Smith argues that the district court erred in finding that he used sophisticated means in his scheme because it did not involve "especially complex or intricate conduct." We review a district court's factual finding that a defendant used sophisticated means for clear error. *United States v. Robertson*, 493 F.3d 1322, 1329–30 (11th Cir. 2007).

The Sentencing Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.9(B). When determining whether a defendant used sophisticated means, the district court is required to focus on the offense conduct as a whole, rather than on each individual step the defendant took. *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015). The Sentencing Guidelines provide that each action taken by the defendant need not be sophisticated

17

in order to support the enhancement, so long as the totality of the scheme was sophisticated. *United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011).

We reject Smith's contention that the scheme was not complex. The scheme involved creating fake invoices to factor non-existent receivables and to provide backup proof to bridge-loan lenders that the deals were legitimate, as well as the fabrication of emails, purchase orders, bank account records, and other business-related documents. *See Ghertler*, 605 F.3d at 1267–68 (affirming sentence with sophisticated means enhancement when defendant conducted research to develop inside information to facilitate scheme to defraud, forged company documents, and used unwitting third parties to conceal the fraud). In fact, the scheme was so complicated that employees at Smith Advertising created a manual with instructions on how to create the invoices, including notes for specific vendors and industries. We conclude that the district court did not err in finding that Smith used sophisticated means in his loan-fraud scheme.

**B.    The District Court's Determination of the Restitution Amount**

Smith also argues that the district court erred in determining the restitution amount. Smith's argument on this point is found in a single, brief paragraph that relies solely on the argument "set forth" in the section of his brief regarding the sentencing enhancements. The government argues that this is insufficient to satisfy

an "argument" on appeal and that therefore Smith has abandoned this issue. We agree.

An appellant abandons an issue on appeal if he fails to develop any argument in support of that issue in his opening brief. *Moran*, 778 F.3d at 985. This requires an appellant to "plainly and prominently" raise an issue, "for instance by devoting a discrete section of his argument to those claims." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (quoting *Cole v. U.S. Att'y Gen.*, 712 F.3d 517, 530 (11th Cir. 2013)). In *Moran*, we held that the appellant abandoned his challenge to the district court's restitution order where, in his initial brief, he stated only that he adopted the same arguments that he had made at sentencing regarding the loss amount and did not "expand[] on his objection to the loss calculation" until he filed his reply brief. 778 F.3d at 985. Because Smith does the same thing here—merely re-stating and re-adopting his foregoing arguments—he has abandoned this issue.

## C.    The Sentence as Procedurally or Substantively Unreasonable

Finally, Smith argues that his 480-month total sentence is procedurally and substantively unreasonable. His procedural argument is that the district court disregarded mitigating evidence, showed an "apparent desire to impose a death sentence," and required Smith to enlist the help of his friends to build a restitution fund. Smith's substantive argument is that his sentence is unreasonable because he

19

accepted responsibility, he presented mitigating evidence, and his total sentence was eight times longer than the statutory maximum of five years faced by his co-conspirators. Smith also argues the district court abused its discretion by imposing a special condition of his supervised release that he "make efforts" for "his friends" to create a fund for restitution payments.

Because Smith preserved the argument as to substantive reasonableness, our review as to the substantive reasonableness of his sentence is under the deferential abuse-of-discretion standard. *See Gall v. United States*, 552 U.S. 38, 51 (2007). But because Smith did not object to the manner in which his sentence was imposed and raises the issue of procedural unreasonableness for the first time on appeal, our review of his procedural argument is limited to plain error. *See United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). Plain error occurs where: (1) there is an error; (2) that is plain; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*; *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005). An error is plain if it contradicts precedent from the Supreme Court or this Court or the explicit language of a statute or rule directly resolving the issue. *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). An error affects a party's substantial rights if it had a substantial influence on the outcome of the case. *United States v. Cruickshank*, 837 F.3d 1182, 1191 (11th Cir. 2016).

20

The district court must impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's future criminal conduct. *See id.*. Additionally, the court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). The party challenging the sentences bears the burden of showing specific facts establishing an unwarranted sentencing disparity. *See United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015).

The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007). A district court abuses its discretion when it fails to consider relevant factors that were due significant weight, gives an improper or irrelevant factor significant weight, or commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010). The district court may not apply a presumption of reasonableness to the Sentencing Guidelines range and must actually consider the relevant statutory factors. *Nelson v. United States*, 555 U.S. 350, 352 (2009). However, the district court need not discuss each individual factor on the record. *See Irey*, 612 F.3d at 1194–95. Rather,

21

it is sufficient for the district court to acknowledge that it has considered the defendant's arguments and the § 3553(a) factors. *Id.* at 1194–95. Therefore, we will vacate a sentence only if the district court "committed a clear error in judgment in weighing the § 3553(a) factors." *Id.* at 1190.

We cannot find any support in the record for Smith's arguments that his sentence is either procedurally or substantively unreasonable. The few examples he offers are unavailing. We disagree with Smith that the district court's comments about the gallows affected his substantial rights, as the district court obviously did not impose a death sentence, expressly declined to impose the maximum sentence of 720 months because such a sentence was "essentially a life sentence," and specifically noted that it expected Smith to live through his prison sentence so that he could reimburse his victims. Thus, Smith cannot show that the district court's comments had a substantial influence on the outcome of the case. *See Cruickshank*, 837 F.3d at 1191.

Moreover, the record belies Smith's argument that the district court failed to consider his mitigating evidence, as it watched his thirty-minute video, read letters from his friends and family, and listened to his allocution and his lawyer's arguments in mitigation. Smith's procedural argument here is really a substantive argument that the district court abused its discretion by unreasonably discounting this evidence. However, the district court did not commit a clear error of judgment by

22

balancing the § 3553(a) factors, as it balanced Smith's mitigating evidence and arguments against the seriousness of the offense, his lack of remorse, and the need for general deterrence. *See* 18 U.S.C. § 3553(a); *Irey*, 612 F.3d at 1190. The same is true as applied to Smith's acceptance of responsibility. Moreover, the 480-month sentence was well below the guideline term and statutory maximum of 720 months, which indicates reasonableness. *See United States v. Croteau*, 819 F.3d 1293, 1310 (11th Cir. 2016) (holding that a sentence was reasonable in part because it was well below the statutory maximum). Additionally, the 480-month sentence did not create an unwarranted disparity with Smith's co-defendants, as none were similarly situated. *See Azmat*, 805 F.3d at 1048. We therefore conclude that the district court neither abused its discretion nor committed plain error when it imposed a 480-month sentence, which was procedurally and substantively reasonable.

Finally, although the government does not address this in its answer brief, we find no error, plain or otherwise, in the imposition of a special condition of supervised release that obliged Smith's friends to make an effort to pay his restitution debt. The record is clear that only Smith is required to make payments, and the district court did not impose any obligation on his friends.

## III.   CONCLUSION

For the foregoing reasons, we affirm Smith's conviction and sentence.

**AFFIRMED.**